**In re GODON, INC., Debtor.**

**No. 01–24209–C–7.**

United States Bankruptcy Court,
E.D. California.

March 15, 2002.

558

**560**

---

Robert S. Bardwil, Sacramento, CA, for Debtor.

J. Russell Cunningham, Sacramento, CA, for trustee.

Thomas A. Aceituno, Folsom, CA, trustee.

OPINION RE AUTHORIZATION PER 11 U.S.C. § 503(b)(3)(B) FOR CREDITOR TO RECOVER FOR BENEFIT OF ESTATE PROPERTY TRANSFERRED OR CONCEALED BY DEBTOR

CHRISTOPHER M. KLEIN, Bankruptcy Judge.

The question is whether vitality remains in the provision for reimbursement of a creditor's expenses and professional fees incurred in recovering property with the court's permission under 11 U.S.C. § 503(b)(3)(B) and (b)(4). Concluding that the Bankruptcy Code carries forward from the former Bankruptcy Act the authority for creditors to sue in the name of the trustee to recover property for the benefit of the estate without needing to have their counsel employed by the trustee, the court will approve an agreement between creditor and trustee to have the creditor prosecute avoiding actions in the trustee's name.

*Jurisdiction*

Federal jurisdiction is founded upon 28 U.S.C. § 1334(a). Arrangements for the exercise of avoiding powers concern estate administration and are core proceedings that a bankruptcy judge may hear and determine. 28 U.S.C. § 157(b)(2)(A).

*Facts*

Godon, Inc., filed its voluntary chapter 7 case soon after creditor Bank of the West commenced fraudulent transfer litigation in state court, alleging that Godon, Inc., had been looted of millions of dollars by insiders and affiliates, including the sole shareholder.

Total debt is about $3.97 million, of which $3.77 million is owed to Bank of the West based on loans backed by a security interest in virtually all personal property assets of debtor and a filed UCC–1 financing statement.

The trustee has about $210,000, most of which remains from the sale of equipment in which the bank claims a security interest. The rest of the estate's assets consist of causes of action against the debtor's insiders and affiliates to recover property allegedly transferred by the corporation, together with a proof of claim in another bankruptcy case.

The bank removed its state court action to bankruptcy court under 28 U.S.C. § 1452, where it is now pending.

The bank and the trustee have agreed to cooperate in attempting to recover assets for the benefit of the estate, with the bank, as the creditor holding 95 percent of the debt, taking the lead, incurring the expense of counsel, and bearing the risk of not recovering enough to have its attorney's fees reimbursed.

The basic terms of the agreement call for the trustee and the bank to fix the amount of the bank's claim ($3,769,899.37), settle the status of its security interest, divide the proceeds of the sale of the equipment covered by the security inter-

est, and "jointly prosecute" litigation to recover assets for the benefit of the estate.

The bank further agrees to various surcharges of its collateral that will enable the trustee to have resources with which to fund litigation and agrees to subordinate, in part, its own payment rights as a secured and an unsecured creditor to those of the other unsecured creditors, who would receive 10 percent of all recoveries until such time as they are paid in full even though they only represent 5 percent of the total debt.

It is agreed that the bank has discretion over which recovery actions to pursue and that it is not obliged to take instructions from the trustee. The bank's counsel, Crosby, Heafey, Roach & May, has the bank, not the trustee, as its client.

Correlatively, it is agreed that the trustee may appear on his own account, represented by his own counsel, Desmond, Nolan, Livaich & Cunningham, in any action being prosecuted by the bank and that the trustee may file and prosecute any other action.

The trustee agrees not to settle, over the objection of the bank, any action filed by the bank. For its part, the bank agrees not to settle any action without giving the trustee an opportunity to object. All settlements are subject to court approval as "fair and equitable."

The bank and trustee mutually reserve the right to object to each other's fees and expenses.

Although the agreement did not mention §§ 503(b)(3)(B) and (b)(4), the parties clarified in open court that those provisions supply the model for what they are attempting to do and that they are content to be governed by those subsections.

### Discussion

The arrangement is simultaneously a request to permit a creditor to prosecute actions in the name of the trustee to recover property for the benefit of the estate and a compromise that must be scrutinized as "fair and equitable."

### I

Sections 503(b)(3)(B) and (b)(4) have faded into such obscurity that it is necessary to begin by reviewing their origin before turning to their application in this case.

### A

It has been a settled feature of bankruptcy law since 1898 that creditors may recover property for the benefit of the estate and have their attorneys' fees reimbursed by the estate.

### 1

Under the former Bankruptcy Act, the reimbursable creditor recovery doctrine started as judge-made law. *See, e.g., Chatfield v. O'Dwyer,* 101 F. 797, 799–800 (8th Cir.1900); 3A James Wm. Moore et al., Collier on Bankruptcy ¶ 64.104 n. 6 (14th ed. rev.1975) ("Collier 14th ed.").

Then, in 1903, Bankruptcy Act § 64 was amended to make explicit what had already been determined to be implicit:

> (a) The debts to have priority, in advance of the payment of dividends to creditors, and to be paid in full out of bankrupt estates, and the order of payment, shall be: (1) ...; where property of the bankrupt, transferred or concealed by him either before or after the filing of the petition, is recovered for the benefit of the estate of the bankrupt by the efforts and at the cost and expense of one or more creditors, the reasonable costs and expenses of such recovery;
> ...

Bankruptcy Act § 64(a)(1), 11 U.S.C. § 104(a)(1) (redesignated from § 64b(2) in 1938) (repealed 1978).

Creditors acting for the benefit of the estate were allowed to use the name of the bankruptcy trustee. *In re Kenny*, 269 F. 54, 57 (W.D.Pa.1920) ([c]reditors "Gamble & Co. were the prosecutors of the suit; the trustee's name being used simply as a legal necessity"); *cf. A.C. James Co. v. Reconstr. Fin. Corp. (In re W. Pac. R. Co.)*, 122 F.2d 807, 808 (9th Cir.1941)(appeal); *Australia v. MacDonald (In re Patterson–MacDonald Shipbldg. Co.)*, 288 F. 546, 548 (9th Cir.1923)(petition for revision & appeal); *Ohio Valley Bank v. Mack*, 163 F. 155, 156 (6th Cir.1906) (appeal); Collier 14th ed. ¶ 62.29[2.4].

A limitation imposed by case law was that once a trustee was appointed, a creditor usually needed permission from the trustee or the court before acting. Collier 14th ed. ¶ 62.29[2.4].[1]

The necessity of such prior permission was an issue in the leading case explaining Bankruptcy Act § 64(a)(1):

> While that section does indeed justify such an award after a motion to compel the receiver or trustee to undertake a litigation, this is a condition upon the right, at least after a receiver has been appointed. The receiver is responsible for the collection of the assets, and he alone can authorize any charges against them. If any creditor, petitioning or other, learns facts which lead him to suppose that property has been concealed, he may, and indeed he should,

advise the receiver, and if the receiver prove slack, he may apply to the referee [bankruptcy judge] to stir him to action. The referee or the [district] judge may then authorize the creditor to proceed, and he will be entitled to his reward under section 64b(2) [64a(1)], but not otherwise.

*In re Eureka Upholstering Co.*, 48 F.2d 95, 96 (2d Cir.1931) (L.Hand, J.) (citations omitted).

It had been established before *Eureka Upholstering* that the trustee could also give sufficient permission to a creditor. *In re Stearns Salt & Lumber Co.*, 225 F. 1, 3 (6th Cir.1915).

2

■ When the authorization for creditors to sue on behalf of the estate to recover property transferred or concealed by the debtor was carried forward into the 1978 Bankruptcy Code as §§ 503(b)(3)(B) and (4), Congress resolved the former ambiguity by making mandatory the judge-made requirement of prior permission as part of the continuing authorization for administrative expenses:

> (b)(3) the actual, necessary expenses, other than compensation and reimbursement specified in paragraph (4) of this subsection, incurred by—
>
> . . .
>
> (B) a creditor that recovers, *after the court's approval*, for the benefit of the estate any property transferred or concealed by the debtor[.]

11 U.S.C. § 503(b)(3)(B) (emphasis added).

Under this administrative expense provision, the authorized creditor is reim-

---

1. The Collier treatise describes the practice under former Bankruptcy Act § 64(a)(1):

 Yet orderly administrative practice calls for a qualification. It is primarily for the trustee to decide whether the estate should embark on an attempt to recover concealed or . transferred assets. The right to attorney's fees is, therefore, limited to cases in which the services are rendered either before a trustee has been appointed or in which a trustee has been given an opportunity to intervene and has refused to do so, even though the creditor is allowed to proceed in the trustee's name.

 Collier 14th ed. ¶ 62.29[2.4], at p. 1578 (footnotes omitted).

bursed under § 503(b)(3)(B), while its attorneys and accountants are compensated under § 503(b)(4):

> (4) reasonable compensation for professional services rendered by an attorney or an accountant of an entity whose expense is allowable under paragraph (3) of this subsection, based on the time, the nature, the extent, and the value of such services, and the cost of comparable services other than in a case under this title, and reimbursement for actual, necessary expenses incurred by such attorney or accountant[.]

11 U.S.C. § 503(b)(4).

An alternative form of advance approval occurs in chapter 11 cases by virtue of the statutory authorization for a plan of reorganization to provide for "the retention and enforcement by the debtor, by the trustee, or by a representative of the estate appointed for such purpose" of any claim belonging to the debtor or the estate. 11 U.S.C. § 1123(b)(3)(B).

■■■■ A key rule of construction for the Bankruptcy Code is that judge-made doctrines developed under the former Bankruptcy Act are presumed to be carried forward except to the extent Congress indicated a contrary intent. *See, e.g., Kelly v. Robinson,* 479 U.S. 36, 47, 107 S.Ct. 353, 93 L.Ed.2d 216 (1986). In the instance of creditor recovery, Congress expressly incorporated the judge-made requirement of prior permission into the statute and made it apply in all cases. *In re Romano,* 52 B.R. 590, 593 (Bankr.M.D.Fla.1985); *In re Spencer,* 35 B.R. 280, 281–82 (Bankr. N.D.Ga.1983); *Lazar v. Casale (In re Casale),* 27 B.R. 69, 70 (Bankr.E.D.N.Y.1983).

■■■ Since the action is maintained for the benefit of the estate, it must be brought in the name of the bankruptcy trustee as the real party in interest. *Hansen v. Finn (In re Curry & Sorensen,*

*Inc.),* 57 B.R. 824, 828–29 (9th Cir. BAP 1986).

■■■ Thus, a creditor acting with judicial permission under § 503(b)(3)(B) may sue in the name of the trustee in the same manner as was permitted under former law. Moreover, Congress contemplated that a creditor may pay its counsel, taking the risk that those fees might not all be reimbursed under the § 503(b)(4) statutory "reasonable compensation" standard.

### 3

Nor does the requirement of standing present an obstacle to a creditor the court authorizes to act under § 503(b)(3)(B). The bewildering variety of decisions discussing creditor standing in bankruptcy, however, warrants that one explain why an authorized creditor has standing.

### a

The basic difficulty with all discussions of standing is that they are vulnerable to the fallacy of ambiguity.

■■■ The term "standing" is ambiguous. It signifies both the "injury in fact" that is the irreducible minimum of the case-or-controversy requirement of Article III and also a higher degree of relation to a matter in litigation that courts or Congress demand as a prudential matter before permitting a party to be heard. The same person may be "injured in fact" for purposes of the constitutional minimum and nevertheless lack standing for prudential reasons because it is possible to have one form of standing but not the other. This leads to the linguistic paradox that a person with standing may lack standing.

■■■ Precision requires that one assign separate terms to various concepts subsumed by the term "standing." The irreducible minimum "injury in fact" for pur-

poses of federal jurisdiction under Article III is termed "constitutional standing."

It is now an article of faith that every litigant in federal court must have "constitutional standing." *UF & CW Union Local 751 v. Brown Group, Inc.,* 517 U.S. 544, 551, 116 S.Ct. 1529, 134 L.Ed.2d 758 (1996); *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992); *Pershing Park Villas Homeowners Ass'n v. United Pac. Ins. Co.,* 219 F.3d 895, 899 (9th Cir.2000).

The second branch of standing is "prudential standing," which subdivides into multiple categories of circumstances in which courts limit the exercise of federal jurisdiction for reasons related to such considerations as orderly management of the judicial system. *Pershing Park,* 219 F.3d at 900–01.

One subcategory of "prudential standing" is "statutory standing" in which Congress has explicitly made the prudential standing determination by designating persons who are entitled to enforce a particular right created by statute.

Where rights or duties are statutory in origin, Congress has broad power to define the classes of persons who may be entitled to enforce them. Implicit in the congressional power to create rights and duties is the power to define the classes of persons who may enforce them. Wm. A. Fletcher, *The Structure of Standing,* 98 YALE L.J. 221, 223–24 (1988). The fact that a legislative grant of standing is usually straightforward leads to few disputes, which explains why there are few reported decisions addressing "statutory standing."

Another subcategory is "non-statutory standing," which consists of persons that either have not been named by Congress in a statute or who want to enforce some right not created by statute. This is where much ink is spilled in case reporters, particularly over the question of third-party enforcement, in which some party that does not have "statutory standing" nevertheless wants to enforce rights without needing to rely on someone that has "statutory standing."

"Constitutional standing" is a jurisdictional limit on the power of federal courts and can never be waived. *Bender v. Williamsport Area Sch. Dist.,* 475 U.S. 534, 541–42, 106 S.Ct. 1326, 89 L.Ed.2d 501 (1986); *Pershing Park,* 219 F.3d at 899; *Ripplinger v. Collins,* 868 F.2d 1043, 1046–47 (9th Cir.1989).

"Prudential standing," in contrast, is not a jurisdictional limit ordained by the Constitution and may be waived in appropriate circumstances. *Pershing Park,* 219 F.3d at 899–900; *Sycuan Band of Mission Indians v. Roache,* 54 F.3d 535, 538 (9th Cir.1995). Likewise, when a matter of "prudential standing" is raised for the first time on appeal, the appellate court has discretion to entertain it as a "purely legal issue" if the record is adequate. *Pershing Park,* 219 F.3d at 901 n. 3; *Sierra Switchboard Co. v. Westinghouse Elec. Corp.,* 789 F.2d 705, 708 n. 1 (9th Cir.1986).

In this vein, it has been cogently argued that the sensible approach is to treat matters of "statutory standing" as elements of the particular legal relief being requested. Fletcher, 98 YALE L.J., at 223–24 & 264–65. Matters of "statutory standing" reflect Congress making pertinent policy determinations in connection with enactment. Other matters of "prudential standing" reflect policy determinations relating to orderly management of the judicial system as to which it is appropriate to expect the trial courts to serve as gatekeepers.

b

■ The standing of creditors in bankruptcy fits within this construct. All creditors are "injured in fact" for purposes of "constitutional standing" because they are able to allege injury that is "fairly traceable" to the bankruptcy; at a minimum, they face the automatic stay and the risk that debts owed to them will be discharged. *Duckor Spradling & Metzger v. Baum Trust (In re P.R.T.C., Inc.)*, 177 F.3d 774, 778 (9th Cir.1999).

■ Some creditors acquire "statutory standing" by virtue of Bankruptcy Code provisions authorizing them to perform specific trustee tasks, as in the case of the court's power to grant permission for a creditor to recover property for the benefit of the estate under either § 503(b)(3)(B) or § 1123(b)(3)(B). *Id.*, at 780–81 (§ 1123(b)(3)(B)); *McFarland v. Leyh (In re Tex. Gen. Petroleum Corp.)*, 52 F.3d 1330, 1335 (5th Cir.1995)(same); *Citicorp Acceptance Co. v. Robison (In re Sweetwater)*, 884 F.2d 1323, 1327 (10th Cir.1989)(same). Similarly, debtors have express statutory authority to exercise trustee avoiding powers in particular situations. 11 U.S.C. § 522(h).

■ In the absence of "statutory standing," creditors participate in bankruptcy litigation only if they have "non-statutory standing," which normally entails an analysis of the nature of the harm suffered in connection with the dynamics of the particular case. Where the creditor would enforce rights that belong to others, a form of third-party standing analysis is applied that focuses upon what is to be gained for the estate. *P.R.T.C.*, 177 F.3d at 781; *Briggs v. Kent (In re Prof'l Inv. Props.)*, 955 F.2d 623, 625 (9th Cir.1992).

■ This is consistent with general third-party standing analysis that looks for three features: Congress has undertaken to regulate a particular relationship; the third party is better prepared to be an effective advocate than the nonparty; and there is little danger of a divergence between the interests of the third party and the nonparty. 13 CHARLES. A. WRIGHT, ARTHUR R. MILLER & EDWARD H. COOPER, FED. PRAC. & PROC. 2d § 3531.9.

■ In the related area of appellate standing, creditors are subject to a prudential, non-statutory requirement that in order to appeal one must be a "person aggrieved," which normally means a person "directly and adversely affected pecuniarily by" the order in question. *P.R.T.C.*, 177 F.3d at 777–78; *Fondiller v. Robertson (In re Fondiller)*, 707 F.2d 441, 442 (9th Cir.1983).

c

It is against this background that our circuit's bankruptcy appellate panel has consistently held that a creditor obtains "derivative standing" to exercise powers that are otherwise reserved to the trustee—i.e., some form of "prudential standing"—when the court authorizes a creditor to do so for the benefit of the estate. *E.g., Curry & Sorensen*, 57 B.R. at 828. But the reasoning has not always been explicit.

The courts of appeals have agreed with the conclusion, likewise without searching explication. *E.g., Avalanche Mar., Ltd. v. Parekh (In re Parmetex, Inc.)*, 199 F.3d 1029, 1031 (9th Cir.1999) (citing *Curry & Sorensen*); *City of Farmers Branch v. Pointer (In re Pointer)*, 952 F.2d 82, 88 (5th Cir.1992) (citing *Curry & Sorensen*); *Neb. State Bank v. Jones*, 846 F.2d 477, 478 (8th Cir.1988) (citing *Curry & Sorensen*).

The decisions also apply the non-statutory species of "prudential standing" when the court either grants such permission to a creditors' committee, rather than to a

creditor, without a provision to that effect in a confirmed plan of reorganization under § 1123(b)(3)(B), or grants permission to do something that reaches beyond § 503(b)(3)(B). *Liberty Mut. Ins. Co. v. Off'l Unsecured Creditor's Comm. (In re Spaulding Composites Co.)*, 207 B.R. 899, 903–05 (9th Cir. BAP 1997); *accord, Commodore Int'l Ltd. v. Gould (In re Commodore Int'l Ltd.)*, 262 F.3d 96, 99–100 (2d Cir.2001) (citing *Spaulding Composites*); *La. World Expo. v. Federal Ins. Co.*, 858 F.2d 233, 247–48 (5th Cir.1988) (citing *Curry & Sorensen*).

Another recognition of non-statutory "prudential standing" underlies decisions authorizing the trustee to transfer or assign avoiding powers without reference to § 503(b)(3)(B). *P.R.T.C.*, 177 F.3d at 781–82; *Prof'l Inv. Props.*, 955 F.2d at 625.

The salient fact about all of these decisions is that they involve "prudential standing" issues, not "statutory standing." First, there are the problems that ensue when the prudential gatekeeper—i.e. the court—either refuses to open the gate or is not asked. Second, there are the problems in which circumstances make it prudent to open the gate for purposes that extend beyond the matters (such as § 503(b)(3)(B) property recovery) for which Congress has explicitly told the court it can open the gate to creditor action on behalf of the trustee. Third, there are the problems that arise when the trustee or debtor in possession performing the duties of the trustee is not interested in pursuing an avoiding action.

"Statutory standing" does not present these problems.

d

 Creditor standing to recover property for the benefit of the estate with judicial permission presents a straightforward question of "statutory standing" conferred by § 503(b)(3)(B).

In the context of a creditor being given permission to recover for the benefit of the estate any property transferred or concealed by the debtor, the source of standing is statutory and has been statutory since at least 1903, when the original version of the creditor recovery provision at Bankruptcy Act § 64(a)(1) was enacted. That statutory authority was carried forward into the Bankruptcy Code of 1978 as § 503(b)(3)(B), with the enhancement inherent in the formalization of the requirement that there be prior judicial permission.

What follows from the statutory nature of the authority to grant permission for creditors to recover property for the benefit of the estate is that the decision whether to grant permission is within the sound discretion of the bankruptcy judge. It is that deferential standard that we have in mind when, in cases such as *Curry & Sorensen*, we speak of promoting "fair and orderly administration of the bankruptcy estate by providing judicial supervision over the litigation to be undertaken." *Curry & Sorensen*, 57 B.R. at 828.

In short, a creditor that obtains permission from the court to recover property for the benefit of the estate and to sue in the name of the bankruptcy trustee under § 503(b)(3)(B) has the same "statutory standing" as the trustee.

B

 It is apparent that the facts of this case fit comfortably within the § 503(b)(3)-(4) creditor recovery model that includes a grant of "statutory standing" to authorized creditors.

1

The trustee lacks the resources to pursue the property that the debtor allegedly transferred or concealed and has not pro-

posed to engage counsel on a contingent fee basis.

The creditor bank, which has the largest economic interest in the outcome, is willing to undertake the task with its own counsel.

The bank has chosen not to confuse the attorney-client relation by funding the trustee's effort and then letting the trustee attempt to hire the bank's counsel as special counsel under § 327(a) and (c), glossing over the disinterestedness requirement and the attorney's ethical duty of loyalty.

All recoveries will be for the benefit of the estate, with the court retaining power to approve compromises.

The trustee, who does have some resources, will remain at arm's length from the bank with the ability to exercise his independent judgment to participate in all litigation with his own counsel if he concludes that the interests of the estate are not being well served by the bank.

Reimbursement of the bank by the estate will be on the basis of "actual, necessary expenses" and only in the event of actual recovery. 11 U.S.C. § 503(b)(3)(B).

The bank's counsel will be eligible for "reasonable compensation" that is "based on the time, the nature, the extent, and the value of such services and the cost of comparable services" in nonbankruptcy cases. 11 U.S.C. § 503(b)(4). This statutory standard is similar, but not identical, to § 330.

In short, this is the paradigm case for implementing the creditor recovery model embodied in § 503(b)(3)(B).

2

In view of the fact that this is not an authorization of employment as counsel to the trustee under § 327, several points of contrast bear emphasis.

■ Even though the action is prosecuted in the name of the trustee, the client of plaintiff's counsel under § 503(b)(3)(B) is the creditor, not the trustee. 4 L. KING, COLLIER ON BANKRUPTCY ¶ 503.11[4] (15th ed. rev.2001).

■ A key difference is that § 503(b)(3)(B) affords a free pass from the "disinterested" requirement of § 327(a). With the exception of debtors' counsel employed under § 327(e), the terms of § 327(a) apply to all special counsel employed by a trustee; but the putative safe harbor of § 327(c) is, by its terms, limited to conflicts of interest, not the statutory "disinterested" requirement. In contrast, § 503(b)(3)(B) finesses all of those issues in favor of having the court act as gatekeeper in order to police any dysfunction.

Another difference is that fees are more likely to be paid from the estate to a professional employed under § 327 than to a professional who must rely on §§ 503(b)(3)(B) and (b)(4) because the latter sections have more limitations.

■ In addition to prior judicial permission, successful recovery is an essential element to the creditor's § 503(b)(3)(B) eligibility. This follows from the statutory language "a creditor that recovers, after the court's approval" in that section. 11 U.S.C. § 503(b)(3)(B).

■ In turn, such creditor eligibility, i.e. actual recovery plus prior judicial permission, is prerequisite to § 503(b)(4) compensation for a professional by virtue of the language "attorney ... of an entity whose expense is allowable under" subparagraph (b)(3). 11 U.S.C. § 503(b)(3)(4). It is not, however, essential that the eligible creditor have actually incurred an expense. *Law Offices of Wake v. Sedona Inst. (In re Sedona Inst.)*, 220 B.R. 74, 81 (9th Cir. BAP 1998).

■ Moreover, services and expenses need to be linked to a recovery of "any

property transferred or concealed by the debtor." 11 U.S.C. § 503(b)(3)(B). Thus, to the extent services are difficult to attribute to a qualifying recovery, the professional bears a greater risk of not being paid.

▪▪▪▪ In contrast, success is merely relevant—albeit powerfully relevant—to § 330 fee awards for counsel employed under § 327. There, the focus is on more subjective factors such as the "value" of the services, taking into account such factors as whether the services were beneficial at the time rendered and subject to a limitation that they must have been reasonably likely to benefit the estate. 11 U.S.C. § 330(a).

Counsel acting pursuant to a § 503(b)(3)(B) grant of permission to a creditor, unlike counsel employed directly by the trustee under § 327, are not required to be "disinterested." To the contrary, the expectation is that counsel is working for the creditor and may well not be "disinterested."

### 3

Prior decisions that have ignored § 503(b)(3)(B) in favor of hiring counsel under § 327 do not make § 503(b)(3)(B) superfluous. But they warrant explanation.

An important early bankruptcy appellate panel decision was *Fondiller* in which a divided panel affirmed § 327 employment of a creditor's counsel to locate and recover concealed and fraudulently conveyed property. *Fondiller*, 15 B.R. at 891–92. It construed a since-repealed restriction in § 327(c) forbidding concurrent representation of a creditor during employment as special counsel as not applying when there is not a conflict of interest.[2] Although then-Bankruptcy Judge Lloyd George probably had the better of the argument in his dissent urging that the restriction was plainly applicable and could not be judicially construed into a corner, Congress mooted the debate when it enacted the majority's distinction as part of the Bankruptcy Amendments of 1984.[3]

*Fondiller*, however, did not address § 503(b)(3)(B). In the convoluted facts of that case, which included support of § 327(c) employment by a rare chapter 7 creditors' committee and counter-suits by the debtor, it did not appear that there was a creditor willing to undertake the financial risks inherent in obtaining § 503(b)(3)(B) permission, hiring counsel, and then not recovering. In the absence of such a creditor, the law firm was understandably not willing to work if it could not be paid in its own right under § 330 as special counsel employed by the trustee. Nothing about *Fondiller* suggests that there would have been any difficulty in utilizing the § 503(b)(3)(B) creditor permission strategy had there been a willing creditor.

Next, the Ninth Circuit rejected a defendant's attack on the employment of a creditor's lawyer under § 327 to prosecute an avoiding action that also sought to im-

---

**2.** The then-applicable version of § 327(c) was:

(c) In a case under chapter 7 or 11 of this title, a person is not disqualified for employment under this section solely because of such person's employment by or representation of a creditor, but may not, while employed by the trustee, represent, in connection with the case, a creditor.

11 U.S.C. § 327(c), *repealed*, 1984.

**3.** The Bankruptcy Amendments of 1984 substituted "unless there is objection by another creditor or the United States trustee, in which case the court shall disapprove such employment if there is an actual conflict of interest" for "but may not, while employed by the trustee, represent, in connection with the case, a creditor." Pub.L. 98–353, § 430(c), 98 Stat. 370 (July 10, 1984).

pose equitable subordination and successor liability on another entity. *Stoumbos v. Kilimnik,* 988 F.2d 949, 964–65 (9th Cir. 1993). Relying on *Fondiller's* analysis of how the interests of the trustee and creditors align with respect to matters that would increase the estate, the court of appeals affirmed the § 327 employment of the creditor's lawyer because there was no actual conflict of interest.

There was no mention in *Stoumbos* of § 503(b)(3)(B), perhaps because the inclusion of equitable subordination and successor liability issues in special counsel's assignment went beyond the recovery-of-property constraint on that section. Nevertheless, nothing about the analysis in *Stoumbos* is inconsistent with potential application of § 503(b)(3)(B) to permit the counsel to prosecute the avoiding actions.

Finally, the Second Circuit applied *Stoumbos* and *Fondiller* to sustain employment of a creditor's counsel under § 327 to prosecute complex negligence and derivative action litigation that was plainly beyond the reach of § 503(b)(3)(B). *Bank Brussels Lambert v. Coan (In re AroChem Corp.),* 176 F.3d 610, 622 (2d Cir.1999). Once again, the presence of issues that extend beyond the limits of recovering property transferred or concealed by the debtor made § 503(b)(3)(B) irrelevant to that case.

Nor does the bankruptcy appellate panel decision in *McCutchen, Doyle, etc. v. Off'l Comm. of Unsecured Creditors (In re Weibel, Inc.),* 176 B.R. 209 (9th Cir. BAP 1994), compel a contrary result. There, a law firm that was *denied* employment under § 327 was correlatively precluded from collecting fees on theories of *quantum meruit,* § 503(b)(1) estate preservation expenses, or § 503(b)(2) payment of § 330 fee awards.

*Weibel* comports with other decisions requiring either § 327 employment or prior permission as prerequisite to compensation under §§ 503(b)(1)(A), (b)(2), and (b)(3)(D). *In re Albrecht,* 233 F.3d 1258, 1261 (10th Cir.2000) (§ 503(b)(1)(A)); *In re Singson,* 41 F.3d 316, 320 (7th Cir.1994)(no prior authorization); *F/S Airlease II, Inc. v. Simon (In re F/S Airlease II, Inc.),* 844 F.2d 99, 108 (3d Cir.1988) (§ 503(b)(1)(A)); *In re Stoico Rest. Group, Inc.,* 271 B.R. 655, 661–62 (Bankr.D.Kan.2002) (§ 503(b)(3)(D)).

Neither *Weibel,* nor the other consistent decisions, involve creditor recovery of transfers for the benefit of the estate with prior court permission under § 503(b)(3)(B). To the extent that *Weibel* has any applicability to § 503(b)(3)(B), it stands for the unremarkable proposition that no compensation will be awarded if the court refuses to grant prior permission. In short, nothing about *Weibel* undermines the vitality of § 503(b)(3)(B).

While these decisions illustrate that § 327 often is essential for bringing counsel into a bankruptcy case, they do not read § 503(b)(3)(B) out of the Bankruptcy Code. While the two sections often overlap, they present different questions.

 Under § 503(b)(3)(B), the bankruptcy court acts as gatekeeper for creditors who want to prosecute actions to recover property transferred or concealed by the debtor. Whether the court chooses to open the gate is a matter of judicial discretion.

## II

 The agreement between the trustee and the bank also includes a compromise that resolves any dispute about the secured status of the bank's claim. In exchange, the estate and creditors receive the benefit of agreed surcharges of collateral and a distribution scheme that amounts to the bank voluntarily subordi-

nating its rights to other unsecured creditors so that they will be paid sooner.

When assessing a compromise, a bankruptcy court is required to make an "informed, independent judgment" about whether the compromise is "fair and equitable." This entails comparing the terms of the compromise with likely rewards of litigation and "all other factors relevant to a full and fair assessment of the wisdom of the proposed compromise," including: (1) probability of success in litigation; (2) likely difficulties in collection; (3) complexity of the litigation; (4) expense, inconvenience, and delay necessarily attending continued litigation; and (5) the paramount interest of creditors and proper deference to any reasonable views they may express. *Protective Comm. of Indep. S'holders of TMT Trailer Ferry, Inc. v. Anderson,* 390 U.S. 414, 424–25, 88 S.Ct. 1157, 20 L.Ed.2d 1 (1968); *Woodson v. Fireman's Fund Insur. Co. (In re Woodson),* 839 F.2d 610, 620 (9th Cir.1988).

In this instance, the compromise is plainly "fair and equitable." There is no indication that a meritorious challenge could be mounted to the bank's secured status. Moreover, there is no indication that the amount of the claim is materially overstated. Thus, defeating the bank's secured status would still leave the bank holding about 95 percent of total debt, which would entitle it to 95 percent of distributions.

Under the compromise, the bank agrees to let the other unsecured creditors have an initial partial distribution from the § 506(c) surcharge it is permitting and to have 10 percent of all subsequent distributions until such time as they have been paid in full. It is also agreeing to permit a substantial surcharge against the secured claim without requiring the trustee to prove all the essential elements of § 506(c), which, under the apparent facts, may be difficult for the trustee to do. Thus, the likely rewards of litigating the details of the bank's secured status and the amount of its claim are less than the benefits of the compromise.

As it is by no means evident that the trustee could make a meritorious challenge to the bank's claim, the probability of success in such litigation is doubtful. Collection issues are irrelevant to this situation as there is no hint that the bank might owe anything to the estate. Similarly, the lack of an apparent meritorious challenge suggests that any such effort would entail complex analysis. It also would be expensive and would delay the time-sensitive recovery litigation that comprises the primary value remaining in the estate. Finally, the other creditors will receive payments on an accelerated rate and in higher amounts than required by the Bankruptcy Code.

Thus, the compromise is "fair and equitable."

An appropriate order will issue.