In re Kaveh LAHIJANI, Debtor.

Kamiar Simantob; Nasser Lahijani, Appellants,

v.

Claims Prosecutor, LLC; Bryan Mashian; Peter C. Anderson, Chapter 7 Trustee, Appellees.

BAP No. CC–04–1350–KMOSN.

Bankruptcy No. SV 98–15561–AG.

·United States Bankruptcy Appellate Panel of the Ninth Circuit.

Argued and Submitted Jan. 20, 2005.

Filed April 21, 2005.

**284**

Herbert N. Niermann, Irvine, CA, for debtor.

Peter C. Anderson, Los Angeles, CA, trustee.

Before: KLEIN, MONTALI, and SNYDER,* Bankruptcy Judges.

## OPINION

KLEIN, Bankruptcy Judge.

What is in a name? Sometimes a lot—of misinformation. If ever there was a misnomer, it is the name of appellee, "Claims Prosecutor, LLC," which should have called itself "Claims Defender" or "Claims Extinguisher" when purchasing the trustee's causes of action to retrieve property allegedly transferred by the debtor. Its owner, who is both a defendant and the debtor's brother-in-law, concedes that the causes of action will not be prosecuted and elected in open court not to attempt to establish that the purchase was in "good faith" for purposes of ·the 11 U.S.C. § 363(m) statutory safe harbor from appellate remedies.

This appeal ties together a number of our recent decisions. We have held that the question whether a purchaser at a court-approved sale acted in § 363(m) "good faith" is to be determined by the trial court with findings based on evidence and that the safe harbor can be waived by omission to present such evidence.[1] We have held that sale of avoiding actions may simultaneously implicate § 363 "sale" analysis and "compromise" analysis under Federal Rule of Bankruptcy Procedure 9019(a).[2] We have also explained that 11 U.S.C. § 503(b)(3)(B) recognizes that courts may authorize a creditor to sue in the name of the trustee, at its own expense (but subject to reimbursement under § 503(b)), to recover property transferred by a debtor.[3]

We now conclude that, when a cause of action is being sold to a present or potential defendant over the objection of creditors, a bankruptcy court must, in addition to treating it as a sale, independently evaluate the transaction as a settlement under the prevailing "fair and equitable" test, and consider the possibility of authorizing the objecting creditors to prosecute the cause of action for the benefit of the estate, as permitted by § 503(b)(3)(B). Accordingly, we REVERSE the order approving the sale of the estate's causes of action under § 363.

---

* Hon. Paul B. Snyder, Bankruptcy Judge for the Western District of Washington, sitting by designation.

1. *T.C. Investors v. Joseph (In re M Capital Corp.)*, 290 B.R. 743, 745 (9th Cir. BAP 2003); *Thomas v. Namba (In re Thomas)*, 287 B.R. 782 (9th Cir. BAP 2002).

2. *Goodwin v. Mickey Thompson Entm't Group, Inc. (In re Mickey Thompson Entm't Group,* *Inc.)*, 292 B.R. 415, 421 (9th Cir. BAP 2003) ("*Mickey Thompson*").

3. *Com–1 Info, Inc. v. Wolkowitz (In re Maximus Computers, Inc.)*, 278 B.R. 189, 197–98 (9th Cir. BAP 2002) ("*Maximus Computers*"); *accord, In re Godon, Inc.*, 275 B.R. 555, 561–63 (Bankr.E.D.Cal.2002) ("*Godon*").

## FACTS

Kaveh Lahijani filed a chapter 7 bankruptcy case in April 1998. Discharge was entered in August 1998. The case was closed as a no-asset case in August 1999.

Nine months after the bankruptcy case was closed, the appellants Kamiar Simantob and Nasser Lahijani (joined by one other person), who had not been scheduled as creditors and did not otherwise know of Kaveh Lahijani's bankruptcy, sued him and others in state court in an effort to recover about $10 million that they alleged was embezzled before the bankruptcy.

The action, *Simantob, et al. v. Lahijani, et al.*, sounding in fraud, was filed in a state court in May 2000.[4] It alleged misrepresentation, concealment, rescission, conspiracy, breach of fiduciary duty, constructive trust, and conversion.

While the state court action was pending, the bankruptcy case was reopened and appellee Peter C. Anderson was appointed chapter 7 trustee. The appellants filed a $9,786,000 proof of claim (all claims total about $13 million) and commenced an adversary proceeding to have the debtor's discharge revoked or have the debt excepted from discharge.

The net result of three years of convoluted state and federal litigation was that, by October 2003, the appellants had lost in state court on all substantive claims for relief and had not succeeded in having the discharge revoked or the debt excepted from discharge.

Left with a simple debt that was subject to a valid discharge, the appellants' only remaining avenue for recovery was to maximize the value of the bankruptcy estate available for distribution to creditors. This they proposed to accomplish through the exercise of the trustee's powers to avoid and recover property that the appellants believed Kaveh Lahijani had fraudulently transferred.

Since the trustee (who says he is unable to evaluate the underlying merits and, in any event, lacks the funds necessary to wage war) was unwilling to pursue the fraudulent transfer and turnover causes of action, the appellants offered to purchase them for a price of one-half of net recoveries.

The appellants' proposal operated to put the avoiding power causes of action into play as assets that could be auctioned.

Kaveh Lahijani's brother-in-law and co-defendant, Bashan "Bryan" Mashian, formed appellee, Claims Prosecutor, LLC ("'Claims Prosecutor'"), in order to acquire the avoiding power causes of action, offering $30,000.

The chapter 7 trustee evaluated the appellants' 50 percent offer as more beneficial to the estate than $30,000 and filed a motion for permission to assign his trustee avoiding powers to the appellants, subject to overbid.

When "Claims Prosecutor" raised its offer to $100,000, the trustee switched positions and proposed to accept that offer, subject to overbid and court approval.

The trustee subsequently issued a supplemental notice of a contested sale hearing at which the estate property would be auctioned. Pursuant to the notice, which purported to detail overbid procedures, both initial and subsequent overbids had to be in cash or cash equivalent.[5]

---

4. Kamiar Simantob, *Kamran Simantob & Nasser Lahijani v. Kaveh Lahijani, Micha Mottale, Venice & Vermont, Inc.,* Bahman ["Bryan"] Mashian, Buchalter, Nemer, Fields & Younger & Does 1—100, No. BC231307, Los Angeles County Super. Ct., filed 5/22/00.

5. The property being sold was described as:

At the sale hearing on June 2, 2004, the trustee insisted that only cash or cash equivalent offers were acceptable to him. He did not explain why percentage offers were unacceptable.

During the bidding, the appellants offered a number of overbids that included additional percentage recoveries for the estate ($101,000 + 10 percent; $110,000 +

> any and all assets of the Estate whether real, personal or otherwise including, but not limited to, the following: any and all known or unknown claims, suits, contracts, judgments, demands, damages, debts, obligations, lawsuits, causes of action, losses, penalties, fines, liabilities (including strict liability), encumbrances, liens, costs or expenses, whether or not ultimately defeated, of whatever kind, nature or description, contingent or otherwise, matured or unmatured, foreseeable or unforeseeable, including [fees and expenses].

Supplemental Notice of Trustee's Motion to Assign Avoiding Powers to Simantob, Subject to Overbid, filed 5/25/04, at 4.

6. The relevant colloquy was:

> [APPELLANTS' COUNSEL]: We'll bid $110,000 plus a 25 percent interest in the recovery.
> COURT: Well, is the Trustee going to object? There may not be a recovery, but they're offering to give a 25 percent recovery.
> [TRUSTEE'S COUNSEL]: ... [B]ecause of the nature of facilitating overbids in this case, we do not want a percentage of the recovery included in the items. We want the sale over with, the Trustee's involvement with that portion of the case over with. ...
> COURT: Well, what does the Trustee deem to be the value of this recovery at this time?
> [TRUSTEE'S COUNSEL]: Your Honor, other than the offers that are made, the Trustee has no way of determining the value of those claims. He has no resources to pursue those claims. So to the estate as it stands right now without any bids, the claims are not of any value to the estate.

Tr. 6/2/04 hearing, at 33.

7. For example, when appellants offered $130,000, plus 25 percent of the recovery, the following colloquy occurred:

25 percent; and $130,000 + 25 percent). The trustee objected to the percentages because he wanted a sum certain so the case could be closed.[6] When the appellants persisted, they were effectively forced to state their bids without adding percentages of recoveries, even though they made a record that they wanted to do so.[7] Their final bid was for $160,000.[8]

> [APPELLANTS' COUNSEL]: We bid $130,000, again, plus 25 percent of any recovery. ...
> [TRUSTEE'S COUNSEL]: The Trustee will not accept the portion that is a percentage of the recovery.
> COURT: ... [are] you going to withdraw your bid?
> [APPELLANTS' COUNSEL]: No, your honor.
> COURT: Or are you going to modify it to limit it to the $130,000?
> [APPELLANTS' COUNSEL]: Well, we're offering that in addition to the $130,000 cash. It's not contingent.
> COURT: I understand, and the Trustee is not accepting that. So then the question is what do we do with your bid. ... Are you going to reject the bid or are you going to ask that the bid be limited to the $130,000?
> [APPELLANTS' COUNSEL]: Well, if I'm forced to do so, the bid will be limited to the $130,000. ...
> [TRUSTEE'S COUNSEL]: The only portion that we would accept, your Honor, is the $130,000 bid. If that bid is made at $130,000 without any percentages, we would accept...
> COURT: Your bid. You want to modify your bid?
> [APPELLANTS' COUNSEL]: Yes, we do, your Honor, but *I want to make it clear for the record that we're offering a percentage of the recovery* ...
> COURT: I think the record is clear as to how the trustee wants to deal with that.

Tr. 6/2/04 hearing at 38–43 (overlapping speech corrected) (emphasis supplied).

8. Appellants did not add a percentage to their $160,000 bid. At oral argument, counsel explained to us that he believed he had already made his record on the point and was reluctant to risk annoying the trial judge. Under the circumstances, we do not believe appel-

The court authorized the trustee to sell the causes of action to "Claims Prosecutor", for its high bid of $175,000 and, as a back-up, to appellants for $160,000.

When the court was asked to find that the purchaser was acting in[1] "good faith" within the meaning of § 363(m) so that the sale could not be upset on appeal,[9] it (correctly) noted that our § 363(m) decisions in *Thomas* and *Mickey Thompson* emphasize the need for evidence to support such a finding and then declined to make a finding unsupported by evidence.

"Claims Prosecutor" declined the court's offer to take testimony directed to the question of § 363(m) "good faith" and represented that the transaction would proceed without the benefit of a finding of "good faith."

This timely appeal ensued.

### JURISDICTION

The bankruptcy court had jurisdiction via 28 U.S.C. §§ 1334 and 157(b)(1). We have jurisdiction under 28 U.S.C. § 158(a)(1).

### ISSUES

1. Whether the court applied the correct legal standard when approving a § 363 sale of causes of action to a defendant for a sum certain over objection by the main creditor in the case, who wanted to pursue the causes of action.

2. Whether the sale of causes of action to defendants in this instance meets the

lants waived their right to urge on appeal that their fixed amount "plus percentage" bid be considered.

9. That safe harbor section provides:
(m) The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a

requirements for approving a compromise as "fair and equitable."

### STANDARD OF REVIEW

 Sales under § 363 are reviewed for abuse of discretion. *Moldo v. Clark (In re Clark)*, 266 B.R. 163, 168 (9th Cir. BAP 2001). It is an abuse of discretion to apply an incorrect legal rule. *Maximus Computers*, 278 B.R. at 194.

### DISCUSSION

This appeal involves the sale of causes of action to a defendant over the opposition of creditors. The rules governing sales are implicated, as are the rules governing compromises.

### I

Bankruptcy trustees are permitted to sell property of the estate not in the ordinary course of business after notice and a hearing. 11 U.S.C. § 363(b)(1).

Objections to sale that are based on inadequacy of price are often resolved by the court ordering an auction, which may occur in open court. Fed. R. Bankr.P. 6004(f).

Causes of action owned by the trustee are intangible items of property of the estate that may be sold. These include causes of action owned by the debtor as of the filing of the case. 11 U.S.C. § 541(a)(1). In addition, property recovered by the trustee pursuant to, inter alia, turnover and avoiding powers, is property of the estate. 11 U.S.C. § 541(a)(3).

sale or lease under such authorization to an entity *that purchased or leased such property in good faith*, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.
11 U.S.C. § 363(m) (emphasis supplied).

Causes of action that exist independent of bankruptcy are commonly sold by bankruptcy trustees under § 363(b).

While there is some disagreement among courts about the exercise by others of the trustee's bankruptcy-specific avoiding power causes of action, the Ninth Circuit permits such actions to be sold or transferred. *Duckor Spradling & Metzger v. Baum Trust (In re P.R.T.C., Inc.),* 177 F.3d 774, 781 (9th Cir.1999) (*"P.R.T.C."*); *Briggs v. Kent (In re Prof'l Inv. Props. of Am.),* 955 F.2d 623, 625–26 (9th Cir. 1992).[10] Thus, we focus first on the transaction under ordinary sale rules.

### A

■ We reject appellants' argument that the avoiding power causes of action should not have been sold to one who would not exercise the powers for the benefit of all creditors.

The difficulty with this argument is that, under the law of the circuit, trustee avoiding powers may be transferred for a sum certain. *P.R.T.C.,* 177 F.3d at 781–82; *Briggs,* 955 F.2d at 625–26. The benefit to the estate in such circumstances is the sale price, which might or might not include a portion of future recoveries for the estate. Thus, *P.R.T.C.* and *Briggs* do not mandate, as appellants contend, that the avoidance powers can only be sold to a creditor who agrees to pursue those avoidance powers for the benefit of all creditors.

To be sure, the common-sense of appellants' argument is captured by the statutory authorization under §§ 503(b)(3) & (4) that permits a creditor, with the permission of the court, to sue in the name of the trustee to recover, for the benefit of the estate, transfers made by the debtor. *Maximus Computers,* 278 B.R. at 197–98; *Godon,* 275 B.R. at 561–69.

While one may wonder whether the analysis in *P.R.T.C.* and *Briggs* would have been the same if the Ninth Circuit had had the benefit of the subsequently-articulated *Maximus Computers–Godon* analysis of §§ 503(b)(3) & (4), *P.R.T.C.* and *Briggs* stand for a broader proposition that extends beyond creditors and that extends beyond the recovery of property transferred by the debtor. Moreover, it is law of the circuit that we must follow.

Viewed as a sale, the question, thus, boils down to whether the sale price to "Claims Prosecutor" created a greater benefit to the estate than the best offer of appellants.

### B

■ The court's obligation in § 363(b) sales is to assure that optimal value is realized by the estate under the circumstances. The requirement of a notice and hearing operates to provide both a means

---

**10.** Most decisions that wrestle with this problem overlook a key statutory analysis that resolves the issue with respect to recovery of property transferred or concealed by the debtor and that, to that extent, makes the *P.R.T.C.–Briggs* analysis unnecessary. The Bankruptcy Code recognizes, albeit obliquely, that a court may authorize a creditor to prosecute an action to recover property transferred or concealed by the debtor, suing in the name of the trustee but at the creditor's risk and expense, and authorizes reimbursement under 11 U.S.C. §§ 503(b)(3) & (4) in the event of success. *Maximus Computers,* 278 B.R. at 197–98; *Godon,* 275 B.R. at 561–69. Thus, it is neither necessary for the trustee to transfer a cause of action to recover property transferred or concealed by the debtor, nor to employ a creditor's attorney as "special" counsel, in order to permit a creditor to prosecute such an action. Note, however, that *P.R.T.C.–Briggs* sweeps broader than § 503(b)(3)(B) because it applies to all causes of action owned by the trustee and does not purport to be limited to recovery of property transferred or concealed by the debtor.

of objecting and a method for attracting interest by potential purchasers. Ordinarily, the position of the trustee is afforded deference, particularly where business judgment is entailed in the analysis or where there is no objection. Nevertheless, particularly in the face of opposition by creditors, the requirement of court approval means that the responsibility ultimately is the court's.

■ The trustee in this instance refused to entertain bids that included a fixed percentage of net proceeds in addition to a sum certain. In effect, he valued the fixed percentage at zero, which he purported to justify on the basis that he had no way to value the merits of the causes of action being sold. The court deferred to the trustee, accepted the trustee's zero valuation of net litigation proceeds, and essentially required the appellants to stop adding a percentage to their offers. They acquiesced after making a record that they wished to continue to add percentages. After bidding $160,000, they let "Claims Prosecutor's" $175,000 bid stand.

Two facets bear on the analysis of the question whether the $175,000 is an appropriate price for the sale. First, there is the problem of thin competition. Second, there is the question whether $175,000 was actually the higher bid in the face of the additional percentage offered by appellants.

■ The price achieved by an auction is ordinarily assumed to approximate market value when there is competition by an appropriate number of bidders. When competition is constrained, however, the price is less likely to be reliable and should be examined more carefully. The sale of a cause of action to a defendant in circumstances in which the plaintiff is the only competitor is an example of constrained competition, that warrants more scrutiny.

When the facades are stripped away in this case, the only bidders were a defendant (who apparently was acting in the interest of all fellow defendants) and the plaintiffs (creditors who held about 70 percent of the debt). While the plaintiffs (our appellant) did not bid more than $160,000, they were willing to add, even though the trustee did not want to hear it, a portion of the net return. The trustee's zero valuation does not inspire confidence in his business judgment.

In addition, it is debatable that $175,000 was actually the high bid in light of the standing offer of a percentage of the net litigation proceeds.[11] An economist would place an "expected value" on such a proposition and discount it to "present value," based on a calculation that, in its simplest form, is the product of the possible result, multiplied by the probability of achieving the result, discounted to present value.[12]

---

11. We are mindful that the final bid by appellants did not state that a percentage of litigation proceeds was also being offered. Under the circumstances, appellants had made a record that amply establishes the percentage additive. In view of the high proportion of appellants' claim in relation to total claims that would cycle a majority of those funds back to appellants, there is no rational reason appellants would have voluntarily ceased including the percentage sweetener.

12. Present value analysis is a well-understood proposition of elementary economics. PAUL A.

SAMUELSON & WILLIAM D. NORDHAUS, ECONOMICS 201–02, 271–73 (14th ed.1992); EUGENE F. FAMA & MERTON H. MILLER, THE THEORY OF FINANCE 27–29, 209–211 (1972). As applicable, here, for example, a probability of .05 (one chance in twenty) of recovering $1 million in three years with a discount rate of 10 percent would be valued as follows. First, ascertain the expected value in the future period: $.05 \times \$1,000,000 = \$50,000$. Second, compute the present value by dividing by 1.1 (i.e., 1 + 10 percent) to the third power (because the period is three years): $\$50,000 \div (1.1 \times 1.1 \times 1.1) = \$50,000 \div 1.331 =$

The crucial point for purposes of the present analysis is that, so long as the pertinent probability is not zero, the expected and present value calculation will yield some value. Any such value should be taken into account.

The consequence is that there is good reason to think that "Claims Prosecutor" was not actually the high bidder. Since it elected to proceed without a determination that it was a "good faith" purchaser within the meaning of § 363(m), there is no impediment to reversing and remanding so that the trial court can evaluate the sale in a manner that gives appropriate value to the appellants' bid.

## II

■ There is, moreover, a problem more fundamental than the sale price.

Since the transaction amounted to acquisition of causes of action by a defendant for $175,000, *Mickey Thompson* teaches that it must also be analyzed as a compromise as to which the court has an independent duty to determine whether it is "fair and equitable." *Mickey Thompson,* 292 B.R. at 420–21.[13]

### A

■ The fair and equitable settlement standard, originally established by the Supreme Court in *TMT Trailer Ferry,* requires consideration of: (a) probability of success in the litigation; (b) collectability; (c) complexity, expense, inconvenience, and delay attendant to continued litigation; and (d) the interests of creditors, which

are said to be "paramount." *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson,* 390 U.S. 414, 424–25, 88 S.Ct. 1157, 20 L.Ed.2d 1 (1968) (Bankruptcy Act); *Woodson v. Fireman's Fund Ins. Co. (In re Woodson),* 839 F.2d 610, 620 (9th Cir.1988); *Martin v. Kane (In re A & C Props.),* 784 F.2d 1377, 1380–81 (9th Cir.1986); *Mickey Thompson,* 292 B.R. at 420.

■ None of this analysis, which is inherently fact-intensive, relative, and contextual, was undertaken by the bankruptcy court.

Some of these issues appear to cut in favor of appellants. Since the interest of creditors is said to be of "paramount" importance and entitled to deference, and since appellants hold the majority of the debt in the case, their position on the amount of the settlement deserves more credence than it received.

Correlatively, while keeping the case open during the life of the anticipated litigation would entail delay, there would be little or no cost to the estate. If, as here, the creditors holding the majority of the claims filed in the case desire to forego the quick payment of what they see as a small dividend and are willing to bear the expenses, their position on this factor is likewise entitled to deference.

Appellants' suggestion that the other creditor that appeared was an LLC that was controlled by the owners of "Claims Prosecutor" has some intuitive appeal. Yet, that possibility is a factual matter that

---

$37,565.74. *Id.* Hence, the present value of one chance in twenty of recovering $1 million after three years is $37,565.74.

**13.** This is also a corollary of the appellate standing rule that, in the context of a sale or other disposition of estate assets, creditors have standing to appeal, but disappointed

prospective bidders who are not creditors usually do not have standing to appeal. *Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.),* 181 F.3d 527, 531 (3rd Cir.1999); *accord, Licensing by Paolo, Inc. v. Sinatra (In re Gucci),* 126 F.3d 380, 388 (2d Cir.1997).

would have to be developed in proceedings in the bankruptcy court.

On balance, the record before us is not adequately developed so as to enable an informed determination.

By not addressing the fair and equitable settlement standard, the bankruptcy court applied an incorrect legal standard and thereby abused its discretion.

Accordingly, the matter needs to return to the bankruptcy court for appropriate proceedings.

### B

On remand, the bankruptcy court should consider the alternative of permitting the objecting creditors to sue in the name of the trustee, but at their own risk and expense, to recover the property allegedly transferred by the debtor.

As explained in *Maximus Computers* and in *Godon,* this alternative is recognized by §§ 503(b)(3)(B) and (4) and carries forward a provision from former Bankruptcy Act § 64a(1).[14]

■ A crucial rule of construction regarding the transition from the Bankruptcy Act to the Bankruptcy Code was that judge-made doctrines were presumed to be carried forward except to the extent Congress indicated a contrary intent. *See, e.g., Kelly v. Robinson,* 479 U.S. 36, 47, 107 S.Ct. 353, 93 L.Ed.2d 216 (1986).

In the instance of § 503(b)(3)(B), Congress demonstrated an intent to keep the creditor-recovery rule of former § 64a(1) in force and, in addition, codified the judge-made rule that the creditor obtain prior permission.[15] *Godon,* 275 B.R. at 562–63.

---

**14.** The House and Senate Reports to the 1978 Bankruptcy Code each state, in identical language, that § 503(b) "is derived mainly from section 64a(1) of the Bankruptcy Act, with some changes" and refer to including "a creditor that recovers property for the benefit of the estate." S. REP. No. 95–989, at 66 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5852; H.R. REP. No. 95–595, at 355 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6311.

Former Bankruptcy Act § 64a(1) provided, in relevant part:

 a. The debts to have priority, in advance of the payment of dividends to creditors, and to be paid in full out of bankrupt estates …:(1) …; where property of the bankrupt, transferred or concealed by him either before or after the filing of the petition, is recovered for the benefit of the estate of the bankrupt by the efforts and at the cost and expense of one or more creditors, the reasonable costs and expenses of such recovery;

Bankruptcy Act § 64a(1), 11 U.S.C. § 104(a)(1) (redesignated from § 64b(2) in 1938) (repealed 1978).

The change made in 1978 was to codify the judge-made rule that the creditor obtain permission before recovering property for the benefit of the estate. 11 U.S.C. § 503(b)(3)(B), *codifying In re Eureka Uphol-*

*stering Co.,* 48 F.2d 95, 96 (2d Cir.1931) (L. Hand, J.); *Godon,* 275 B.R. at 562.

Creditor recovery was authorized by a 1903 amendment to the Bankruptcy Act, making explicit what had already been recognized as implicit by judge-made law. *Chatfield v. O'Dwyer,* 101 F. 797, 799–800 (8th Cir.1900); *Godon,* 275 B.R. at 561; 3A JAMES WM. MOORE ET AL., COLLIER ON BANKRUPTCY ¶ 64.104 n. 6 (14th ed. rev.1975).

**15.** Judge Learned Hand made the classic statement of the prior-permission requirement for the creditor-recovery rule:

 While [§ 64a(1)] does indeed justify such an award after [a] motion to compel the receiver or trustee to undertake a litigation, this is a condition upon the right, at least after a receiver [trustee] has been appointed. The receiver [trustee] is responsible for the collection of the assets, and he alone can authorize any charges against them. If any creditor, petitioning or other, learns facts which lead him to suppose that property has been concealed, he may, and indeed he should, advise the receiver [trustee], and if the receiver [trustee] prove slack, he may apply to the referee [bankruptcy judge] to stir him to action. The referee [bankruptcy judge] or the [district]

■ Under that practice, a creditor acting under the statutory creditor-recovery authority was, and remains, permitted to sue in the name of the trustee to recover the subject property. *Id.* The creditor, upon obtaining permission to act, has statutory standing to sue. *Id.* at 562–66.

The litigation is conducted at the creditor's risk and expense. Counsel is employed by, and ordinarily paid by, the creditor. *Maximus Computers*, 278 B.R. at 197–98. Moreover, a lawyer hired by a creditor acting pursuant to § 503(b)(3)(B) is not required to be employed by the trustee under 11 U.S.C. § 327, even though the creditor is suing in the name of the trustee. *Id.* Unless the lawyer contracts with the creditor to accept only what compensation may ultimately be awarded after the fact under § 503(b)(4), the creditor is responsible for paying counsel according to their agreed-upon terms and bears the risk of not being reimbursed.

■ A creditor's willingness to bear the risk and expense on behalf of the estate for litigating to recover property that would be property of the estate and that would not otherwise deleteriously affect the administration of the estate is a matter that the bankruptcy court is obliged to consider when weighing a compromise that would eliminate the recovery action.

## CONCLUSION

The bankruptcy court abused its discretion when it approved the sale of estate assets, including the avoiding power causes of action, to "Claims Prosecutor" without appropriately evaluating appellants' bid and without analyzing the situation through the matrix of the fair and equita-

judge may then authorize the creditor to proceed, and he will be entitled to his reward under [§ 64a(1)], but not otherwise.

ble settlement standard. REVERSED and REMANDED for further proceedings consistent with this opinion.

*Eureka Upholstering Co.*, 48 F.2d at 96 (L. Hand, J.) (citations omitted).