**NOT FOR PUBLICATION**

## UNITED STATES BANKRUPTCY APPELLATE PANEL
## OF THE NINTH CIRCUIT

| | |
|---|---|
| In re: | BAP No. CC-17-1334-SKuL |
| **CHAD PAUL DELANNOY,** | Bk. No. 8:17-bk-10423-ES |
| Debtor. | |
| **CHAD PAUL DELANNOY,** | |
| Appellant, | |
| v. | **MEMORANDUM**[*] |
| **WOODLAWN COLONIAL, L.P.;** **THOMAS H. CASEY,** | |
| Appellees. | |

Argued and Submitted on May 24, 2018
at Pasadena, California

Filed – August 31, 2019

Appeal from the United States Bankruptcy Court
for the Central District of California

---

[*] This disposition is not appropriate for publication. Although it may be cited for whatever persuasive value it may have, *see* Fed. R. App. P. 32.1, it has no precedential value, *see* 9th Cir. BAP Rule 8024-1.

Honorable Erithe A. Smith, Bankruptcy Judge, Presiding

────────

Appearances:    Robert P. Goe of Goe & Forsythe, LLP argued for appellant; Howard M. Bidna of Bidna & Kets, APLC argued for appellee Woodlawn Colonial, L.P.

────────

Before: SPRAKER, KURTZ, and LAFFERTY, Bankruptcy Judges.

### INTRODUCTION

Debtor Chad Paul Delannoy appeals from an order authorizing the chapter 7[1] trustee, Thomas H. Casey, to sell and compromise appeal rights arising from a state court judgment against Delannoy for conversion and money had and received. The judgment creditors' successor in interest, Woodlawn Colonial, L.P., sought to purchase the appeal rights for the express purpose of dismissing the appeal. In turn, dismissal potentially would move Woodlawn one step closer to asserting the issue preclusive effect of the state court's judgment and findings in Woodlawn's pending nondischargeability action against Delannoy.

Delannoy argued in the bankruptcy court that Casey proposed the sale in bad faith and for an improper purpose. He also argued that his competing bid to purchase the appeal rights was markedly superior to

────────

[1] Unless specified otherwise, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532, and all "Rule" references are to the Federal Rules of Bankruptcy Procedure.

2

Woodlawn's final bid. Delannoy additionally claimed that the sale to Woodlawn constituted an impermissible waiver of his discharge.

The bankruptcy court rejected each of these arguments. On appeal, Delannoy again asserts the same arguments. But he has not demonstrated that the bankruptcy court committed reversible error in rejecting them. Accordingly, we AFFIRM.

## FACTS

Before Delannoy filed his chapter 7 petition, his employer, Alessa Leigh LLC and its member, R. Scott Bell, sued Delannoy for conversion and monies had and received under California law. After commencement of the civil suit Delannoy pled guilty to one count of grand theft in violation of Cal. Penal Code § 487(a). As part of his plea, Delannoy admitted that, "on or about and between 12/20/10 and 7/1/13 I did unlawfully and fraudulently appropriate, convert, steal and embezzle property belonging to [Scott Bell], my employer . . . ."[2] Notwithstanding this admission, Delannoy attempted at trial in the civil matter to deny taking Alessa Leigh LLC's and Bell's personal property. The state court found Delannoy's

---

[2] The record on appeal does not include a copy of the guilty plea. The above referenced quotation from the guilty plea was set forth in paragraph 30 of Woodlawn's exception to discharge complaint, filed in the bankruptcy court on May 10, 2017. In his answer to the complaint, filed on June 12, 2017, Delannoy admitted as follows: "Answering paragraph 30, Defendant admits that the guilty plea referenced in this paragraph speaks for itself." We can take judicial notice of the filing and contents of these pleadings. *See O'Rourke v. Seaboard Sur. Co. (In re E.R. Fegert, Inc.)*, 887 F.2d 955, 957–58 (9th Cir. 1989).

testimony not credible and, at times, evasive.

Also at the civil trial, the state court accepted Delannoy's admissions that he made checks payable to cash drawn on Alessa Leigh LLC's and Bell's bank accounts and deposited those checks in his personal bank account. The state court generally prohibited Delannoy from offering testimony attempting to explain his check cashing practices.

On January 8, 2016, the state court entered its tentative statement of decision on the claims for conversion and monies had and received. Ultimately, it held that Delannoy converted $462,857 of the plaintiffs' cash and was liable for $259,673 in prejudgment interest for the converted cash. Additionally, the state court held that Delannoy was liable for $59,550.07 for converted personal property other than cash, including prejudgment interest. The court set the plaintiffs' punitive damages claims for further trial on July 25, 2016, after which it awarded plaintiffs a total of $60,000 in punitive damages based on its finding that Delannoy acted with both fraud and malice. The state court then entered judgment against Delannoy, setting forth many of the same factual findings in its judgment as it had set forth in its statement of decision. Alessa Leigh LLC and Bell subsequently assigned the judgment to Woodlawn.

Delannoy appealed the state court judgment and also commenced his chapter 7 case. Woodlawn then filed a nondischargeability complaint against Delannoy seeking to have the judgment debt excepted from

discharge under §§ 523(a)(2), (4), and (6). The state court appeal is still pending. Unless Delannoy prevails in that appeal, Woodlawn intends to assert that the state court's findings are entitled to issue preclusive effect in the nondischargeability action.

In the main bankruptcy case, Casey filed a motion seeking to sell the appeal rights to Woodlawn for $7,500, subject to overbid. In his memorandum in support of his motion, Casey explained that prosecuting the appeal on behalf of the estate would be costly and stated his conclusion that there was "minimal likelihood of success."[3] Casey also explained that abandonment of the appeal rights to the debtor would yield "no value to the Estate," unlike the sale he was proposing. Based on these facts, and on his and his counsel's assessment of the appeal of the underlying judgment, Casey asserted that the proposed sale represented "optimal value" for the appeal rights.

Casey further maintained that his proposed disposition of the appeal rights constituted a fair and reasonable compromise that also could be approved under Rule 9019. In support of this assertion, Casey analyzed the proposed compromise under the four "*A & C Props.* factors"[4] and concluded that the factors supported the compromise. Among other things,

---

[3] Casey estimated that prosecution of the appeal would cost the estate somewhere between $35,000 and $45,000 in legal fees and expenses.

[4] *Martin v. Kane (In re A & C Props.)*, 784 F.2d 1377 (9th Cir.1986).

5

Casey pointed out that the only potential benefit to the bankruptcy estate arising from a successful prosecution of the appeal would be the partial or full disallowance of Woodlawn's claim. Under no circumstances would the resolution of the appeal result in an increase in estate assets. In addition, Casey reiterated that successful prosecution of the appeal was highly unlikely.

Delannoy opposed the sale and compromise of the appeal rights. He expressed a much more optimistic view of the likelihood of success on appeal. But even if the court concluded that the prospects of prevailing on appeal were very poor, Delannoy insisted that *his* proposal to purchase the assets for a similar amount was "vastly superior" because he promised to prosecute the appeal to conclusion at no expense to the estate. In Delannoy's own words: "even if Debtor only possessed merely a 1% chance of success on appeal, a sale to Debtor for the same price Woodlawn has offered to pay($7,500), ensuring the meaningful prosecution of the appeal, is a vastly superior outcome to the proposed sale to Woodlawn." Opposition to Motion to Sell Appeal Rights (August 24, 2018) at p. 6.

In support of his opposition, Delannoy submitted the declaration of his state court counsel as well as key documents from the litigation. In essence, Delannoy claimed that the proposed sale was not in the estate's best interest because the appeal, if prosecuted successfully, would dramatically increase the recovery from the estate for the estate's

6

unsecured nonpriority creditors (other than Woodlawn). Alternately, Delannoy claimed that, even if the court were to find the $7,500 sale price fair and reasonable, it only should permit a sale at that price to Delannoy. Delannoy represented that, if he were the successful purchaser, he would pursue the appeal rights at no cost to the estate.

Delannoy also opposed any sale of the appeal rights as worthless. He incorporated into his opposition the estate distribution analysis set forth in his pending motion to compel Casey to abandon the appeal rights. According to Delannoy's calculations, if the appeal rights were sold for $7,500, and all of the other property of the estate were sold for $75,000 as separately proposed by Casey, "general unsecured creditors will receive no more (and likely, much less) than 3% on account of their claim." Opposition to Motion to Sell Appeal Rights (August 24, 2018) at p. 5 n.4.[5]

Finally, Delannoy contended that Casey improperly proposed to sell

---

[5] Casey's other sale motion, seeking authority to sell all of the estate's other property for $75,000, was heard at the same time as the motion to sell the appeal rights, and the bankruptcy court entered an order approving that sale on September 29, 2017. Delannoy did not appeal this other sale ruling. The bankruptcy court also heard Delannoy's abandonment motion at the same time it heard the sale motions. The bankruptcy court denied the abandonment motion, and Delannoy did not appeal that ruling. At the hearing, Delannoy all but abandoned his abandonment motion and instead offered a competing $8,500 bid for the appeal rights that he claimed was a much better deal for the estate (than Woodlawn's purchase offer) because it included a promise to prosecute the appeal rights at no cost to the estate. According to the bankruptcy court, the willingness of both parties to make competing bids for the appeal rights convinced it that the appeal rights had some value to the estate and thus that the abandonment motion should be denied.

Woodlawn the appeal rights for the express purpose of enabling it to dismiss the appeal and invoke issue preclusion. This, Delannoy argued, amounted to an impermissible waiver of Delannoy's right to a discharge in violation of § 524(c).

At the hearing on the sale and compromise motion, Casey again stressed his opinion that the likelihood of success on the appeal was minimal. He further argued that the costs and delay associated with keeping the estate open while the appeal was prosecuted exceeded any benefit the estate could realize from reducing Woodlawn's claim. Delannoy submitted an overbid at the sale hearing of $8,500. Woodlawn then bid $9,000. Delannoy's final bid was for $9,500. Woodlawn's final bid was for $10,000, and the bankruptcy court approved the sale for that amount to Woodlawn.

The bankruptcy court agreed with Casey's view of the proposed sale of the appeal rights. The court specifically found that Casey had proposed the sale in good faith, for a sound purpose, and that the sale was in the estate's best interests.

In the process of ruling, the bankruptcy court also considered the merits of the state court appeal and the likelihood of the appellant prevailing. After carefully reviewing the state court's statements of decision and its judgment, as well as the declarations of counsel for both parties assessing the likelihood of success on the merits, the bankruptcy

court twice referred to the appeal as a longshot. The court also described the chance of appellant completely prevailing as "probably highly unlikely" and "probably unlikely." The bankruptcy court also indicated that the complexity of the matter and the delay associated with prosecution of the state court appeal favored Casey's proposed sale to Woodlawn. The court concluded that, in light of all of the circumstances mentioned above, the proposed sale to and compromise with Woodlawn was reasonable.

As for the paramount interest of creditors, the bankruptcy court concluded that creditors other than Woodlawn would prefer an expeditious resolution of the bankruptcy case as opposed to a delayed resolution with the possibility of Woodlawn's claim being reduced as a result of the potential outcome of the appeal. Ultimately, the court's assessment of the paramount interests of the estate's creditors hinged on its view of what those creditors likely would receive with and without a reduction of Woodlawn's claim. The court held that, under any realistic scenario, the bankruptcy distribution to the estate's unsecured creditors would be de minimis. In other words, in the absence of any meaningful increase in the potential recovery for other unsecured creditors from the continued prosecution of the appeal, the court reasoned that an expedited resolution of the estate was in the best interests of the estate. As the bankruptcy court put it:

> We don't have any other creditors here to argue one way or the other as to whether or not they would prefer to have a shot at

reducing the Woodlawn claim at some point depending on how the -- how the appeal goes or whether they would prefer to have the bird in the hand. Even though it's only an extra $500, it's here, and the Trustee continues to administer the case and close it out.

Hr'g Tr. (Sept. 7, 2017) at 70:2-71:7.

On November 1, 2017, the bankruptcy court entered its order authorizing Casey to sell the appeal rights, and to compromise them, in exchange for Woodlawn's payment of $10,000 to the estate. Delannoy timely appealed the sale and compromise order.

## JURISDICTION

The bankruptcy court had jurisdiction under 28 U.S.C. §§ 1334 and 157(b)(2)(N) and (O). We have jurisdiction under 28 U.S.C. § 158.

## ISSUE

Did the bankruptcy court abuse its discretion when it approved the sale and compromise of the appeal rights?

## STANDARD OF REVIEW

We review the bankruptcy court's sale authorization under § 363 for an abuse of discretion. *Fitzgerald v. Ninn Worx Sr, Inc. (In re Fitzgerald)*, 428 B.R. 872, 880 (9th Cir. BAP 2010). We similarly review compromises approved pursuant to Rule 9019. *Goodwin v. Mickey Thompson Entm't Grp., Inc. (In re Mickey Thompson Entm't Grp., Inc.)*, 292 B.R. 415, 420 (9th Cir. BAP 2003).

A bankruptcy court abuses its discretion if it applies an incorrect

10

legal rule or if its factual findings are illogical, implausible or without support in the record. *United States v. Hinkson*, 585 F.3d 1247, 1261-62 (9th Cir. 2009) (en banc).

## DISCUSSION

**A.     Legal Standards Governing Sale and Compromise of Estate Claims.**

When a bankruptcy trustee proposes to sell the estate's legal claims, we typically require the trustee, and ultimately the bankruptcy court, to assess the desirability and propriety of the sale in two different ways. Not only must the sale pass muster as a sale of estate property under § 363, but also the sale normally should be scrutinized as a compromise under Rule 9019. *Simantob v. Claims Prosecutor, LLC (In re Lahijani)*, 325 B.R. 282, 289-90 (9th Cir. BAP 2005) (citing *In re Mickey Thompson Entm't Grp., Inc.*, 292 B.R. at 420-21). *Accord, In re Fitzgerald*, 428 B.R. at 884.

We require the trustee and the bankruptcy court to assess the sale of the estate's claims as a compromise because, when the target of the litigation (the defendant or the appellee) purchases the claims, the sale usually results in termination of that litigation. In essence, the sale functions as a settlement of the underlying litigation. *See Fridman v. Anderson (In re Fridman)*, 2016 WL 3961303 (Mem. Dec.) (9th Cir. BAP July 15, 2016) (citing *In re Lahijani*, 325 B.R. at 290). We require this extra scrutiny of a proposed sale of estate claims because competition to purchase the claims often is limited or constrained. *In re Lahijani*, 325 B.R. at

11

289. Ordinarily, only the litigants are interested in purchasing the claims, because they already have a stake in the outcome of the litigation. *Id.* A sale price obtained from the litigants in the underlying dispute may not reflect the "optimal value" for the estate in administering the claims. *Id.*[6]

In this instance, there is no legitimate dispute that the bankruptcy court applied the correct legal standards for sales under § 363. The estate's representative must propose the sale in good faith and for a proper purpose. *See 240 N. Brand Partners, Ltd. v. Colony GFP Partners, L.P. (In re 240 N. Brand Partners)*, 200 B.R. 653, 658 (9th Cir. BAP 1996). The sale also must be in the best interests of the estate and yield "optimal value under the circumstances." *In re Lahijani*, 325 B.R. at 288. The court referenced these factors and made determinations as to each of them.

Nor is there any real dispute that the bankruptcy court articulated and applied the appropriate factors for evaluating a compromise under Rule 9019. The compromise must be fair and equitable. *In re Mickey Thompson Entm't Grp., Inc.*, 292 B.R. at 420 (citing *In re A & C Props.*, 784 F.2d at 1381). To determine the fairness and equity of the proposed compromise, the bankruptcy court is required to analyze the transaction

---

[6] While a sale of estate claims almost always will necessitate treatment as a compromise, it is not always true that a compromise involving estate claims will need to be separately evaluated as a sale of estate property. Because of the limited interest in and competition for purchasing the claims, a sale process under the auspices of § 363(b) might not always be desirable. *See In re Mickey Thompson Entm't Grp., Inc.*, 292 B.R. at 422 & n.7.

with the following factors in mind:

> (a) The probability of success in the litigation; (b) the difficulties, if any to be encountered in the matter of collection; (c) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; [and] (d) the paramount interest of the creditors and a proper deference to their reasonable views in the premise.

*In re Mickey Thompson Entm't Grp., Inc.*, 292 B.R. at 420 (citing *In re A & C Props.*, 784 F.2d at 1381).

Importantly, so long as the trustee and the bankruptcy court work within the confines of the above-referenced analytical framework, their informed decisions and judgment as to what sort of transaction was desirable and appropriate is entitled to deference and "great latitude." *Id.*

## B. Delannoy's Arguments on Appeal.

Delannoy makes several arguments on appeal, but they ultimately reduce to two broad propositions. First, Delannoy contends that the sale of his appeal rights was improper because it effectively terminated his challenge to the largest claim against the estate and negatively impacted his discharge. Second, he maintains that the appeal rights were worthless, but proceeds to argue that the bankruptcy court erred in approving the sale to Woodland because his offer provided more benefit to the estate. We consider each argument in turn.

### 1. Propriety of the Sale of Defensive Appeal Rights.

Chapter 7 bankruptcy trustees are fiduciaries of the bankruptcy

estate statutorily obligated to promptly "collect and reduce to money the property of the estate for which such trustee serves, and close such estate as expeditiously as is compatible with the best interests of parties in interest." § 704(a)(1). As is often repeated, property of the estate is broadly defined to include "all legal or equitable interests of the debtor in property as of the commencement of the case." § 541(a)(1). A debtor's property interests are defined by state law. *Butner v. United States*, 440 U.S. 48, 55 (1979). In this instance, California law governs, and it defines property to include any "right [] created or granted by statute." Cal. Civ. Code § 655. "Under California law, the right to appeal an adverse judgment is a right created by statute." *In re Marciano*, 2012 WL 4369743 (C. D. Cal. 2012) (citing *Cobb v. Univ. of So. Cal.*, 32 Cal. App. 4th 798, 801 (1995)); *see also Mozer v. Goldman (In re Mozer)*, 302 B.R. 892, 895-96 (C.D. Cal. 2003). Casey maintains that he was statutorily obligated to promptly liquidate the estate's interest in the appeal rights, and that he properly did so by selling those rights to the highest bidder after taking competing bids.

Delannoy does not challenge the trustee's ability to sell his defensive appeal rights. Instead, he argues that the sale was improper because it could not result in a meaningful distribution to the unsecured creditors. Delannoy also argues that the sale of the appeal rights impermissibly interfered with one of the cornerstone goals of the Code: his fresh start. *See generally Grogan v. Garner*, 498 U.S. 279, 286 (1991). We address both of

14

these arguments below.

### a. The Trustee Properly Sought to Liquidate an Asset of the Estate.

Delannoy posits that it was obvious the proposed sale would not yield any recovery for the estate's unsecured creditors, and, therefore, it was error to approve the settlement. He first argued that Casey abused his position as trustee by attempting to sell a worthless asset. However, the bankruptcy court rejected Delannoy's argument that the appeal rights were worthless when it denied his motion to compel abandonment of the appeal rights under § 554(a). Delannoy never appealed that decision. Moreover, the offer and competing bids resulted in a $10,000 sale. This amount was not inconsequential, and precludes Delannoy's argument. Accordingly, Casey properly sought to liquidate the estate's interests in the appeal rights.

Delannoy next argues that the sale was improper because the proposed sale amount ($7,500) doubtlessly was less than the resulting administrative expenses incurred to propose and effectuate the sale. He urges the court to adopt a per se rule that precludes the approval of a sale that does not generate a recovery for the unsecured creditors net of associated administrative expenses. He believes that the proposed sale was made in bad faith and simply to increase Casey's recovery of his commission and legal fees.

Delannoy's argument is factually unsupported. The proposed sale

15

contemplated overbids, and was not necessarily limited to $7,500. In fact, the sale ultimately yielded a higher price of $10,000. Accordingly, the asset had value. Delannoy counters that the bankruptcy court should not have approved the sale because the sale never would have yielded sufficient proceeds to cover more than the trustee fees and legal fees arising from the sale process. Yet, there is no serious argument that, absent Delannoy's strenuous and continuing opposition to the sale, it would have yielded net proceeds beyond the amount necessary to compensate Casey and his counsel. Moreover, there was no information presented during the sale and compromise proceedings regarding the trustee's projected legal fees arising from the proposed sale. In short, the amount of legal fees incurred by the trustee largely was the result of Delannoy's opposition to the sale and not a result of the sale itself.

In support of his position, Delannoy relies on *In re KVN Corp.*, 514 B.R. 1 (9th Cir. BAP 2014), but his reliance on *KVN* is misplaced. *KVN* involved a proposed sale of estate property that was fully encumbered by a security interest in favor of Wilshire State Bank. *Id.* at 3. In exchange for the bankruptcy trustee's help in selling the assets, the Bank proposed to split with the estate the net sale proceeds, which the trustee estimated would yield a few thousand dollars for the estate. *Id.* The bankruptcy court denied the trustee's motion for authorization to sell the property, and the trustee appealed. *Id.* at 4. After noting the rule generally prohibiting sales of fully

16

encumbered estate property, and the rule presuming the impropriety of "carve out" agreements, we vacated and remanded for further fact findings.[7] We held that the presumption of impropriety was rebuttable and that the bankruptcy court failed to make relevant findings regarding whether, on the record presented, the trustee had overcome the presumption.

*KVN* stands for the general proposition that bankruptcy trustees should not sell fully encumbered assets, particularly when the estate's unsecured creditors will not benefit from the sale. *KVN* has no application here. Casey proposed to sell *unencumbered* appeal rights. Furthermore, as suggested above, by far the biggest obstacle to Casey realizing any net sale proceeds for the benefit of the estate's unsecured creditors is, and always has been, Delannoy's strenuous opposition to the sale. The trustee properly sought to sell an asset of the estate. That Delannoy has attempted to thwart that sale by pressing continuous legal challenges and increasing administrative expenses does not render the sale improper.

---

[7] When a secured creditor agrees to share with the bankruptcy estate the proceeds from the sale of fully encumbered estate property in exchange for administration (sale) of the asset through the bankruptcy estate, the agreement commonly is known as a "carve out" agreement because the secured creditor carves out from its entitlement to the sale proceeds a specific amount or percentage for the benefit of the estate. *See id.*

### b. The Sale of the Appeal Rights did not Impair the Debtor's Discharge.

Delannoy contends that, even if the appeal rights were an asset subject to liquidation by the estate, the bankruptcy court should not have permitted Casey to sell them to Woodlawn because the sale ultimately would enable Woodlawn to assert the preclusive effect of the state court's findings in the nondischargeability action. Delannoy reasons that, *if* the state court findings are given preclusive effect, he essentially would be barred from mounting a meaningful defense against Woodlawn's exception to discharge claims. According to Delannoy, this is tantamount to a waiver of his right to a discharge.

More specifically, Delannoy contends that the sale of his appeal rights violated § 524(c). That provision imposes significant restrictions on a *debtor's* ability to waive discharge as to particular debts by entering into reaffirmation agreements with creditors. Section 524(c) has no application to the trustee's sale of the appeal rights.

Woodlawn candidly acknowledges that it purchased the appeal rights to terminate the state court action thereby rendering its judgment against Delannoy final. Woodlawn further admits that it will seek to use the preclusive effect of the state court's findings to bar Delannoy from relitigating identical issues in the nondischargeability action. Delannoy insists that the sale of the appeal rights impermissibly interferes with his entitlement to a discharge. We disagree.

18

In making his discharge-related argument, Delannoy relies upon the unpublished decision of this panel in *In re Fridman*, 2016 WL 3961303. But *Fridman* never held that a bankruptcy sale of appeal rights arising from a state court judgment that might have some sort of preclusive effect in a subsequent nondischargeability action impermissibly interferes with the debtor's discharge. *See id.* at *1 & n.3. To the extent *Fridman* is relevant here, it only stands for the general proposition that appeal rights are property of the estate that can be sold and compromised subject to the requirements of § 363 and Rule 9019. *Id.* at *7. Delannoy has not disputed this proposition.

Dismissal of the state court appeal is in no way the functional or legal equivalent of a waiver of discharge. Issue preclusion and exceptions to discharge are distinct legal doctrines with drastically different legal standards. *Compare* § 523(a) (identifying grounds for nondischargeability) *with Plyam v. Precision Dev., LLC (In re Plyam)*, 530 B.R. 456, 462 (9th Cir. BAP 2015) (identifying standards for issue preclusion). The standards of *both* doctrines would need to be satisfied before the bankruptcy court could declare Woodlawn's judgment debt nondischargeable.

While issue preclusion generally can be applied in nondischargeability actions, *see Garner*, 498 U.S. at 284-85, it does not obviate the requirement that the plaintiff establish all of the elements of nondischargeable conduct. *Id.* Furthermore, dismissal of the state court appeal is only one of many steps Woodlawn would need to take to

19

successfully assert issue preclusion. In California, all of the following

threshold requirements must be satisfied before any finally-determined

issue *might* be given preclusive effect:

> (1) the issue sought to be precluded from relitigation is identical to that decided in a former proceeding; (2) the issue was actually litigated in the former proceeding; (3) the issue was necessarily decided in the former proceeding; (4) the decision in the former proceeding is final and on the merits; and (5) the party against whom preclusion is sought was the same as, or in privity with, the party to the former proceeding.

*In re Plyam*, 530 B.R. at 462. Even when these threshold requirements are

met, imposition of issue preclusion remains a matter of discretion. *Id.* at

461-62. A court considering application of issue preclusion must weigh the

effect of applying the doctrine in the particular case against the policies

underlying the doctrine. *Id*.

Because the dismissal of the state court appeal and waiver of

Delannoy's discharge are not the same, we reject Delannoy's discharge-

related argument.[8]

---

[8] We express no opinion regarding whether the sale of defensive appeal rights ever might be so inconsistent with the debtor's fresh start, or with other critical bankruptcy goals, that sale of them to the party opposing the debtor would be impermissible. The circumstances presented in this appeal make it a poor candidate for exploring the outer boundaries of the trustee's right to sell defensive appeal rights. As described above, these circumstances include the unchallenged findings: (1) that the appeal was a longshot; and (2) that sale of the appeal rights would enable the trustee to expeditiously complete administration of the bankruptcy estate.

**2. The Bankruptcy Court Did Not Err in Authorizing the Sale of the Appeal Rights to Woodlawn.**

Delannoy asserts that the bankruptcy court erred in approving the sale of the appeal rights to Woodlawn because his offer was better and more valuable to the estate. He maintains that his $9,500 bid to purchase the appeal rights was better for the estate than Woodlawn's winning bid of $10,000 because he promised to prosecute the appeal rights at no cost to the estate. Delannoy claims that the bankruptcy court failed to account for the value to the estate inherent in his promised prosecution of the state court appeal.

**a. Sales Price.**

Delannoy argues that the $500 difference between his offer and Woodlawn's final bid was immaterial, particularly given the significant benefit Delannoy believed would accrue to the estate by permitting him to continue to contest the primary claim against the estate. The fact remains, however, that the estate conducted an auction for the asset and Woodlawn prevailed as the highest bidder. *See generally In re Mickey Thompson Entertainment Group, Inc.,* 292 B.R. at 422 ("entertaining overbids often triggers a bidding sequence that may lead to a much higher price.").

**b. Continued Litigation.**

Delannoy asserts that the bankruptcy court failed to properly credit the benefit to be gained by his continued litigation against Woodlawn. Delannoy argues that the bankruptcy court erred in accepting Woodlawn's

offer because it effectively terminated his continued prosecution of the appeal. Delannoy viewed the continued litigation as being in *his* best interests as it prevented Woodlawn from asserting in the bankruptcy court that he was precluded from relitigating the state court's findings in the pending nondischargeability action. The pending appeal further preserves any chance (no matter how remote) Delannoy has of overturning the state court judgment.

The bankruptcy court considered both the merits of the appeal and the likely effect of the continued litigation upon the estate. As to the merits, the bankruptcy court found that Delannoy's chances on appeal were a "longshot." Importantly, Delannoy has not challenged this finding on appeal. Given the uphill battle Delannoy faced in prosecuting the state court appeal, the bankruptcy court further found that the benefit to the *estate* from Delannoy's continued litigation in the state courts was de minimis. The court noted that such litigation could not possibly yield any additional assets for the estate as it was limited to adjudication of the creditor's claims against the debtor. Additionally, the court reasoned that Delannoy's appeal was not likely to completely eliminate Woodlawn's claim. The bankruptcy court concluded that, even if the appeal was partially successful, Delannoy might (at most) reduce Woodlawn's share of the unsecured creditor pool from roughly 90% (as it currently existed) to 60%-70% of claims. As the bankruptcy court put it:

In terms of creditors, as I said before, the likelihood that this claim is going to be reduced to zero I think is fairly low. So the question is that assuming that there could be some reduction, what impact would that be – would that have on other unsecured creditors. We have a creditor here who I believe the claim is currently 90 percent of the claim pool. Maybe that goes down to 70 percent, 60 percent, probably not much lower than that to be honest, and then having the distribution amongst all creditors and also taking into account that there are going to be administrative expenses of the estate, obviously they get paid ahead of general unsecured creditors.

The distribution to creditors I think under almost any scenario is going to be de minimis, so de minimis that I can't say that the Trustee would be in error to accept the Woodlawn offer over the Debtor's offer.

Hr'g Tr. (Sept. 7, 2017) at 71:20-72-10.

The bankruptcy court's distribution analysis did not estimate specific amounts or percentages the unsecured creditors could expect to recover with or without reduction of Woodlawn's claim. Nor is it necessary for us to parse the record in an attempt to calculate precise amounts or percentages. Regardless, the bankruptcy court correctly surmised that, under any reasonably likely scenario, the distribution would remain de minimis. The court obviously understood that reducing Woodlawn's claim from roughly 90% of the unsecured creditor pool to 60% of the pool necessarily would increase the remaining creditors' share of any distribution. But even in that scenario, because of the limited amount of

23

assets available, the distribution would remain de minimis. The record reflects that there was, in total, $85,000 in estate assets to be distributed; however, that amount necessarily would be reduced by Delannoy's exemptions totaling slightly more than $20,000, and a priority tax claim in the approximate amount of $19,000, leaving $46,000 before accounting for administrative expenses.[9]

With regard to administrative expenses, in addition to more than $6,000 in statutory trustee's fees, Delannoy's appeal brief references interim fees awarded to trustee's counsel of roughly $30,000. We must point out that such fees were not sought, or known, at the time of the proposed sale. Moreover, this amount included, in part, some fees incurred after the sale was approved. Still, the point remains that the trustee's expected commission and his expected legal fees left a relatively small amount to distribute amongst the unsecured creditors, regardless of the extent of Woodlawn's participation. Indeed, by Delannoy's own admission, given the limited amount of the assets available for distribution, the percentage recovery to unsecured creditors (without a reduction of Woodlawn's claim) most likely was going to be "much less" than 3%: "general unsecured creditors will receive no more (and likely, much less) than 3% on account of

_____

[9] These amounts are consistent with those set forth in Delannoy's creditor distribution analysis. As for the aggregate amount of unsecured debt, according to Delannoy, at the time of his bankruptcy filing, there was roughly $1,130,000 in nonpriority unsecured debt, of which $936,000 was Woodlawn's judgment claim.

their claim." Opposition to Motion to Sell Appeal Rights (August 24, 2018) at p. 5 n.4.

The bankruptcy court weighed the uncertainty, delay and costs associated with continued prosecution of the appeal against what it perceived to be a speculative chance to slightly increase the distribution to unsecured creditors. The bankruptcy court, in the final analysis, found that this slight possible bump in the distribution amount did not outweigh the uncertainty, delay and costs. We cannot say that this finding was illogical, implausible or unsupported by the record.

In closing, we note that a debtor's best interests do not always overlap with those of the bankruptcy estate. This is such a case. In approving the trustee's sale of the appeal rights to Woodlawn, the bankruptcy court properly took the merits into account, as well as the de minimis effect a partially successful appeal would have upon unsecured creditor distributions. Also, the court properly considered the additional time necessary to complete the state court appeal, which if successful would include not only the appeal, but any possible matters on remand.[10]

_____

[10] Even if Delannoy had succeeded beyond the expectations of the bankruptcy court and obtained reversal of the judgment, that reversal most likely would not have meant a full and final defeat of the legal claims underlying the judgment. In light of the types of issues Delannoy's counsel suggested would be raised on appeal (regarding denial of additional time for discovery and exclusion of Delannoy's evidence), if the state appellate court agreed with Delannoy, the trial court presumably would have been compelled to retry the case. The potential costs and delay arising from such a retrial

(continued...)

Delannoy has not persuaded us that any of the bankruptcy court's critical findings were clearly erroneous. While the sale of the appeal rights may impact Delannoy's efforts to relitigate the state court's findings, in this instance that possibility did not render the sale improper.

## CONCLUSION

For the reasons set forth above, we AFFIRM the bankruptcy court's order approving the sale and compromise of the appeal rights.

---

[10](...continued)
would only have made prosecution of the appeal even less desirable from the estate's perspective.