

**NOT FOR PUBLICATION**

**UNITED STATES BANKRUPTCY APPELLATE PANEL**
**OF THE NINTH CIRCUIT**

|  |  |
|---|---|
| In re:<br>MIOMNI GAMING, LTD.,<br>              Debtor. | BAP No. NV-23-1126-BNF<br><br>Bk. No. 22-14240-gs |
| MIOMNI SPORTS, LTD.,<br>           Appellant,<br>v.<br>SBC NEVADA, LLC; TROY STEPHENS<br>FOX, Chapter 7 Trustee,<br>           Appellees. | **MEMORANDUM***  |

Appeal from the United States Bankruptcy Court
for the District of Nevada
Mike K. Nakagawa,** Bankruptcy Judge, Presiding

Before: BRAND, NIEMANN,*** and FARIS, Bankruptcy Judges.

## INTRODUCTION

Appellant Miomni Sports, Ltd. ("Sports") appeals: (1) an order granting

the chapter 7[1] trustee's motion to sell certain causes of action to SBC Nevada,

---

\* This disposition is not appropriate for publication. Although it may be cited for whatever persuasive value it may have, *see* Fed. R. App. P. 32.1, it has no precedential value, *see* 9th Cir. BAP Rule 8024-1.

\*\* Debtor's case and associated adversary proceeding have since been assigned to the Hon. Gary A. Spraker.

\*\*\* Hon. Jennifer E. Niemann, U.S. Bankruptcy Judge for the Eastern District of California, sitting by designation.

[1] Unless specified otherwise, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532, all "Rule" references are to the Federal Rules of Bankruptcy Procedure, and all "Civil Rule" references are to the Federal Rules of Civil Procedure.

1

LLC ("SBC"), the debtor's largest creditor; and (2) an order denying Sports's motion to reconsider the sale order. Sports did not obtain a stay of the sale order, and the bankruptcy court made a finding that SBC was a good faith purchaser entitled to protection under § 363(m). Because the record supports the court's good faith finding, we AFFIRM.[2]

## FACTS

### A.  Background of the parties and prior litigation

Shareholders Andrew Watt (46%), Michael Venner (46%), and Philip Konstan (8%) own Miomni Holdings Co. ("Holdings"). Holdings, in turn, is the 100% owner of Sports,[3] debtor Miomni Gaming, Ltd. ("Debtor"), and Miomni Ltd. ("Limited") (collectively, the "Miomni Entities"). Holdings, Sports, and Debtor were formed in the United Kingdom; Limited is a Nevada LLC. Watt, Venner, and Konstan are the managers of the Miomni Entities.

Holdings owns intellectual property consisting of software used for gaming purposes, which it licenses to other entities. Debtor was created to provide mobile application gaming software and services to gaming entities. Sports was created to provide software to support gaming and retail establishments and to develop and manage players' accounts related thereto. As the Miomni Entities put it, Debtor held a mobile app license while Sports held a platform license. Despite the distinction, Watt admitted that the technologies are essentially the same and provide the same service.

---

[2] Appellee Troy S. Fox, chapter 7 trustee, has not appeared in this appeal.

[3] Sports was originally called Miomni Media, Ltd. but changed its name to Sports in November 2021.

In 2014, Debtor entered into a 10-year software licensing agreement with Holdings. Debtor derived its income from sublicensing gaming IP licenses to others. In 2015, Debtor expanded its business to the U.S. and began offering its mobile gaming app services to casinos in Nevada.

In late 2015, SBC sought a Nevada gaming manufacturer to develop a mobile sportsbook app to provide on-demand sports betting for consumers from their mobile devices. In 2016, SBC and Debtor entered into a series of agreements for the purpose of developing the sports-betting app.

SBC later sued Debtor in Nevada state court for breach of contract and other claims. A seven-day bench trial began on November 29, 2021. The next day, Miomni Media, Ltd. changed its name to Sports. The trial ended on March 3, 2022. Sports registered to do business in Nevada on March 15, 2022.

In May 2022, the state court entered a judgment in favor of SBC and against Debtor for $5,506,400 plus interest. Shortly afterwards, Holdings terminated its software licensing agreement with Debtor on the basis that Debtor had become insolvent "due to a combination of bad debts and legal disputes in the U.S." According to Debtor, it could no longer operate and service its contracts with its nine casino customers once Holdings terminated its license.

## B.     Debtor's bankruptcy filing and subsequent events

The day before SBC's scheduled judgment debtor examination, Debtor filed its chapter 7 bankruptcy case. Troy S. Fox ("Trustee") was appointed as the chapter 7 trustee.

3

## 1. SBC's adversary complaint

Soon after Debtor's bankruptcy filing, SBC filed an adversary complaint against the Miomni Entities (including Debtor), alleging claims for actual and constructive fraudulent transfers under § 548(a)(1)(A) and (B), successor liability (as to Sports), and alter ego. SBC alleged that, as the state court litigation proceeded against Debtor in 2021 and 2022, the principals of the Miomni Entities engaged in a scheme to transfer assets out of Debtor and into Sports, Holdings, and Limited.

Specifically, alleged SBC, just after the trial ended, Watt, Venner, and Konstan wound up Debtor's business and, once Sports was organized in Nevada, fraudulently transferred all of Debtor's IP assets and lucrative casino licensing contracts to Sports, thereby leaving Debtor without funds to pay the SBC judgment. SBC alleged that Sports was operating the same apps Debtor had operated prior to the bankruptcy filing and that Sports paid no consideration for the transfer of Debtor's assets to Sports. SBC further alleged that the nondebtor Miomni Entities were utilizing Debtor's infrastructure and employees, further demonstrating that they were a continuation of Debtor, alter egos of Debtor, and fraudulent transferees that conspired to commit the transfers.

Watt denied that Debtor's assets were transferred to Sports. He explained that once Holdings terminated Debtor's license, Debtor could no longer service its contracts with its nine casino customers. Therefore, Sports had to step in and temporarily service the contracts to mitigate damages to

4

Debtor's customers, which Sports was doing at a financial loss. Watt stated that most of the casino customers have since found another servicer.

### 2. Sale to SBC

On January 26, 2023, Trustee entered into a Sale Agreement with SBC. Under the Sale Agreement, Trustee agreed to sell and assign to SBC all of Debtor's claims against Sports, Holdings, Limited, and any other transferees of Debtor's assets related to the claims in SBC's adversary complaint ("Claims"). SBC would finance the litigation, and any proceeds recovered would first be used to reimburse SBC for its reasonable legal fees and costs. Trustee and SBC agreed to share any remaining litigation proceeds as follows: the first $200,000 would be split evenly between Trustee and SBC; the next $300,000 would be split 33.33% to Trustee and 66.66% to SBC; the remaining funds would be split 5% to Trustee and 95% to SBC until Trustee had recovered enough money to pay all allowed claims in full. SBC waived its right to any recovery from Trustee's portion of the litigation proceeds. If SBC wished to settle the Claims, it had to seek court approval under Rule 9019.

That same day, Trustee filed a motion to sell the Claims to SBC under § 363(b), (f), and (m) ("Sale Motion"). Trustee contended that the estate lacked funds to litigate the Claims and that, in his business judgment and under the circumstances, it was in the best interest of the estate and creditors to have SBC litigate them for the benefit of the estate and to divide any recovered proceeds with Trustee. SBC had been pursuing similar claims against Debtor and others and knew their business operations, and SBC was motivated to

5

pursue the Claims. Trustee said he considered the estate's options, including analyzing and evaluating the risk and expense of such litigation. Trustee believed that pursuit of the litigation would be expensive and time consuming, and it carried the risk of zero recovery. With SBC pursuing the Claims, contended Trustee, there was no risk or cost to the estate, and there was a guaranteed minimum recovery to the estate if there was a recovery by SBC. In Trustee's judgment, the Sale Agreement provided the best opportunity for a recovery by creditors. Trustee believed that no one other than the parties in the adversary proceeding would be interested in buying the Claims and that an auction would not be beneficial.

Trustee requested a finding that SBC was a good faith purchaser under § 363(m). In support, Trustee averred that the Sale Agreement represented the best terms available under the circumstances. Trustee stated that his negotiations with SBC had been conducted at arms' length and in good faith and that there were no side agreements, arrangements, or understandings between him and SBC or any other parties.

Trustee additionally requested that the Sale Motion be heard on shortened time ("OST"), citing three reasons. First, the court had recently denied SBC's request for a temporary injunction and stay relief in the adversary proceeding for lack of standing, but standing could be cured if the court approved the Sale Motion. Second, defendants' answers to SBC's adversary complaint were due on February 3, and any standing issues they might raise in opposition would be mooted if the court approved the Sale

6

Motion. Finally, based on SBC's allegations of further fraudulent transfers and dissipation of estate assets, Trustee asserted a need to move quickly to protect estate assets and resolve whether SBC could purchase the Claims.

Also on January 26, counsel for Trustee notified Debtor's counsel about the Sale Agreement and asked if he would stipulate to a hearing on shortened notice. Debtor's counsel refused and asked Trustee if he had approached the nondebtor Miomni Entities about purchasing the Claims. Trustee said he was open to offers better than SBC's. Trustee reiterated to Debtor's counsel that he could not find an attorney who was willing to take on the Claims litigation under any type of fee arrangement, so SBC's offer to do so with zero risk to the estate was very compelling.

On January 27, the bankruptcy court granted the OST request and set a hearing on the Sale Motion on shortened notice for February 8, with oppositions due by February 3 ("OST Order"). Trustee served a copy of the OST Order on all parties listed on the mailing matrix. He did not, however, serve a copy of the Sale Motion on all parties. Rather, only those parties who were registered with ECF (counsel for Debtor and SBC, Trustee, and the U.S. Trustee) were served with the Sale Motion.

That same day, Watt emailed Trustee stating that the "Miomni Entities" planned to oppose the Sale Motion and were seeking counsel. In response, Trustee stated that it was not clear which of the entities Watt was referring to, but they were free to get counsel and oppose the Sale Motion.

7

Three days later, Watt emailed Trustee stating that Sports wished to make a "counter offer" for $50,000. Sports could pay $20,000 up front and make three additional monthly payments of $10,000. Trustee replied that he received the offer and that it was under consideration, but he suggested that Sports file an opposition to the Sale Motion, indicating that it had made an offer. Trustee also asked Watt to clarify what Sports was purchasing for $50,000. Watt responded four days later on February 3 stating that Sports wanted to buy the Claims for $50,000 and that he had instructed Debtor's counsel to oppose the Sale Motion and request an open bid process. Watt noted that Sports was still seeking U.S. counsel. That was the last communication between Trustee and any representative of the Miomni Entities.

### 3. The hearing and court's ruling on the Sale Motion

The bankruptcy court held a brief hearing on the Sale Motion on February 8. Debtor did not file an opposition, Sports filed neither an opposition nor anything further regarding its $50,000 offer, and no one appeared for any of the Miomni Entities at the hearing. After discussing the Sale Motion with Trustee and counsel for SBC, the court said it would grant the motion as "unopposed."

Trustee then informed the court that Watt had approached him with a cash offer on behalf of Sports for $50,000 and that he had advised Watt to get counsel and file something with the court. Trustee said that he had not been provided any proof of funds or other evidence that Sports could go through

8

with a sale, and there was no further correspondence from Watt or Sports. Despite this, Trustee said he considered Sports's offer but, in his business judgment, decided that SBC's offer was superior because he questioned the veracity of Sports's offer and its ability to fund the purchase.

The court held that it had enough information to grant the Sale Motion "as being in the best interest of the estate in absence of any competing offers of record or actually on the docket or other appearances." It then articulated its findings in support of approving the Sale Motion, including making a finding of good faith under § 363(m).

The court entered a written order consistent with its oral ruling approving the Sale Motion ("Sale Order"). The Sale Order stated that there were "no oppositions on file," that there were "no overbidders (qualified or otherwise)," and that the Sale Motion had been "properly and timely noticed." SBC then dismissed Debtor from the adversary proceeding.

### 4. Motion to reconsider the Sale Order

Sports moved for reconsideration of the Sale Order, citing Civil Rules 59 and 60. Sports argued that its $50,000 offer was superior to SBC's, but Trustee and the court failed to fully analyze it, which resulted in the court erroneously granting the Sale Motion on the grounds that there were "no overbidders (qualified or otherwise)." Sports argued that rushing the sale hearing on shortened time was inequitable and deprived the court of the opportunity to evaluate competing offers or consider other potential bids. Sports argued that

9

it was prejudiced by the shortened time because it was unable to retain U.S. counsel before the February 8 hearing.

Trustee and SBC opposed reconsideration of the Sale Order. Trustee said he did consider Sports's $50,000 offer. He was concerned that the offer did not come from an attorney and that no details as to the sale terms were provided. In Trustee's opinion, the offer appeared to be Watt's attempt to avoid the alter ego litigation against the nondebtor Miomni Entities and the judgment. Sports had not provided any proof of funds or explanation as to the source of the funds. Trustee was concerned that if the alter ego allegations raised by SBC were true, Sports would be using estate funds to purchase the Claims. Further, despite Watt's representation that Sports (or Debtor) would be filing an opposition to the Sale Motion, nothing was filed, which further led Trustee to doubt the veracity and validity of the offer.

In reply, Sports argued that the bankruptcy court's finding that notice was proper was erroneous because Trustee failed to serve the Sale Motion on all interested parties. Sports argued that service of the OST Order on all parties did not cure the notice issue because that order did not identify which "Claims" were being sold, the sale price, or the buyer. Sports argued that the notice issue alone, which precluded other offers for the Claims, warranted setting aside the Sale Order.

The bankruptcy court denied the reconsideration motion, ruling that Sports had not established grounds for relief under Civil Rules 59 or 60. The court found that Sports did not demonstrate any clear error or manifest

injustice in entering the Sale Order, nor had it shown any mistake or inadvertence. The court found that the Sale Motion was properly noticed, Sports pursued an offer with Trustee, no objections were filed, and none of the Miomni Entities appeared at the sale hearing. Because Sports communicated its offer well before the sale hearing, the court found that Sports had not demonstrated circumstances beyond its control that prevented it from responding effectively to the Sale Motion. Finally, the court found that Sports had not offered any evidence of fraud, misrepresentation, or misconduct by SBC or Trustee. This timely appeal followed.

## JURISDICTION

The bankruptcy court had jurisdiction under 28 U.S.C. §§ 1334 and 157(b)(2)(N). We have jurisdiction under 28 U.S.C. § 158.[4]

---

[4] As a threshold matter, SBC argues that Sports as a disappointed bidder lacks standing to appeal the Sale Order, and therefore we lack jurisdiction. Generally, a disappointed bidder who is not a creditor lacks appellate standing to challenge an approved sale. *Simantob v. Claims Prosecutor, LLC (In re Lahijani),* 325 B.R. 282, 290 n.13 (9th Cir. BAP 2005) (citing *Calpine Corp. v. O'Brien Env't Energy, Inc. (In re O'Brien Env't Energy, Inc.),* 181 F.3d 527, 531 (3rd Cir. 1999); *Licensing by Paolo, Inc. v. Sinatra (In re Gucci),* 126 F.3d 380, 388 (2d Cir. 1997)).

However, two days after SBC filed its answering brief challenging Sports's appellate standing and within the time set for filing claims, Sports filed a proof of claim in Debtor's case, and Debtor filed amended schedules reflecting the claim. The claim, to which no objection has been made, is prima facie valid. Rule 3001(f). We have located no binding authority that Sports's post-appeal creditor status results in appellate standing retroactively. Nor have we found binding authority that it does not do so.

Some courts outside the Ninth Circuit have held that a disappointed bidder who is not a creditor has standing to appeal an approved sale if the bidder is challenging matters regarding the integrity of the sale. *See Kabro Assocs. of W. Islip, LLC v. Colony Hill Assocs. (In re Colony Hill Assocs.),* 111 F.3d 269, 274 (2d Cir. 1997) (unsuccessful bidder has standing to appeal when challenging the "intrinsic fairness" of the sale); *see also Stark v. Moran (In re Moran),* 566 F.3d 676, 681-82 (6th Cir. 2009) (recognizing that an exception to the general

**ISSUE**

Did the bankruptcy court clearly err in finding that SBC was a "good faith purchaser" within the meaning of § 363(m)?

**STANDARD OF REVIEW**

Whether a purchaser is a good faith purchaser under § 363(m) is a question of fact we review for clear error. *Adeli v. Barclay (In re Berkeley Del. Ct., LLC)*, 834 F.3d 1036, 1041 (9th Cir. 2016); *Thomas v. Namba (In re Thomas)*, 287 B.R. 782, 785 (9th Cir. BAP 2002). A factual finding is not clearly erroneous unless it is illogical, implausible, or without support in the record. *Retz v. Samson (In re Retz)*, 606 F.3d 1189, 1196 (9th Cir. 2010).

**DISCUSSION**

**A.    Section 363(m) generally**

Sales of estate property under § 363(b) and (c) are protected from appeals by the "safe harbor" provision of § 363(m). *See Paulman v. Gateway Venture Partners III, L.P. (In re Filtercorp, Inc.)*, 163 F.3d 570, 576-77 (9th Cir. 1998); *Ewell v. Diebert (In re Ewell)*, 958 F.2d 276, 280 (9th Cir. 1992); *Clear Channel Outdoor, Inc. v. Knupfer (In re PW, LLC)*, 391 B.R. 25, 35 (9th Cir. BAP 2008). Under § 363(m), the reversal or modification on appeal of an

rule that disappointed bidders lack standing to appeal an approved sale may exist where the bidder "challenges the intrinsic structure of the sale because it is tainted by fraud, mistake, or unfairness") (citation omitted).

Sports argues that the sale was tainted by fraud and unfairness, asserting that Trustee treated it unfairly by telling Watt that Sports's offer for the Claims was under consideration, but never telling Watt that he had decided to reject it. While we do not agree as a general principle that a disappointed bidder may challenge a sale based on intrinsic fairness, in this instance, we agree that Sports has standing to appeal the Sale Order.

authorization of a sale of property does not affect the validity of a sale to an entity that purchased the property in good faith, unless the sale was stayed pending appeal.

Where no stay pending appeal is obtained, an appellate court is precluded from reviewing issues other than whether the buyer purchased the property in "good faith." *See Ferrari N. Am., Inc. v. Sims (In re R.B.B., Inc.)*, 211 F.3d 475, 478 (9th Cir. 2000); *In re Ewell*, 958 F.2d at 280-81. Stated differently, "even though an appeal from an order approving a sale is moot if the sale has not been stayed and is consummated, there are several exceptions. One exception to the mootness rule is for appeals questioning whether the purchaser purchased the property in good faith." *Fitzgerald v. Ninn Worx Sr, Inc. (In re Fitzgerald)*, 428 B.R. 872, 880 (9th Cir. BAP 2010) (cleaned up).

**B.    The bankruptcy court did not clearly err in finding that SBC was a good faith purchaser within the meaning of § 363(m).**

The bankruptcy court denied a stay of the Sale Order, and Sports did not seek a stay from the Panel. Because Sports did not obtain a stay, we are precluded from reviewing anything other than the issue of whether SBC purchased the Claims in good faith. The parties have failed to recognize this very important issue and wrongfully assume that we are reviewing the merits of the Sale Order and can "undo" the sale for reasons other than a clearly erroneous finding of good faith by the bankruptcy court. Insofar as the issues raised by the parties do not relate to good faith, we cannot, and do not, consider them.

13

"[A] good faith purchaser is one who buys in good faith and for value." *In re Ewell*, 958 F.2d at 281 (cleaned up); *see also T.C. Invs. v. Joseph (In re M Cap. Corp.),* 290 B.R. 743, 746 (9th Cir. BAP 2003). "Typically, lack of good faith is shown by fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders." *In re Ewell*, 958 F.2d at 281 (cleaned up) (quoting *Cmty. Thrift & Loan v. Suchy (In re Suchy),* 786 F.2d 900, 902 (9th Cir. 1985)). The burden of proof to show good faith is on the proponent of good faith. *In re M Cap. Corp.,* 290 B.R. at 747. Parties who desire the protection of § 363(m) are required to establish an evidentiary record for the bankruptcy court to make the necessary factual finding of good faith. *Id.* at 745.

In support of a good faith finding, Trustee averred in the Sale Motion that the Sale Agreement with SBC represented the best terms available under the circumstances and, in his business judgment, was the best chance at recovery for the insolvent estate and its creditors. Trustee averred that his negotiations with SBC were conducted at arms' length and in good faith, and that there were no side agreements, arrangements, or understandings between him and SBC or any other parties. These averments were not challenged. Although Watt told Trustee that the Miomni Entities (including Debtor) were going to oppose the Sale Motion, no opposition was filed, no one appeared at the sale hearing for any of the Miomni Entities, and no one complained of any alleged bad-faith conduct or impropriety by Trustee or SBC.

At the sale hearing, the bankruptcy court found that the sale was conducted in good faith. Sports did not challenge the sale until its motion to reconsider, and even then it did not expressly challenge the good faith finding under § 363(m). Nonetheless, on reconsideration, the court again found good faith, noting that Sports had not offered any evidence of fraud, misrepresentation, or misconduct by Trustee or SBC. Now, for the first time on appeal, Sports alleges collusion between Trustee and SBC.

Sports argues that the integrity of the sale was compromised and that the record does not support a finding of good faith. Consequently, argues Sports, the bankruptcy court clearly erred in finding that SBC was a good faith purchaser under § 363(m).

First, Sports argues that Trustee's request for shortened time to hear the Sale Motion was not in the best interest of the estate, but rather was to further SBC's agenda and interests. Trustee stated three reasons for the OST, which Sports argues were not valid: (1) to cure SBC's lack of standing in the adversary proceeding; (2) to moot SBC's standing issue if raised by defendants in their answers; and (3) to prevent further dissipation of Debtor's assets.

The record supports the bankruptcy court's finding that "sufficient cause" existed to grant Trustee's request for an OST. Trustee believed that time was of the essence and that he needed to protect the estate from what he suspected was misconduct by Debtor's principals and affiliates, which is his duty as a trustee. The sooner SBC's standing was resolved, the sooner SBC

15

could pursue the Claims for the benefit of the estate and creditors. And resolving SBC's standing before defendants' answers were due would help facilitate the litigation and reduce costs, which was also a benefit to the estate and creditors.

Sports next argues that Trustee demonstrated bias against it regarding the sale. For example, Sports contends that Trustee misled Watt by telling him that he had received Sports's offer and that it was under consideration, but Trustee failed to tell Watt that he would not actually consider the offer unless Sports provided proof of funds or other documentation and filed the offer with the court. Sports contends that Trustee never voiced any of his concerns to Watt or Sports about the need for proof of funds or additional documentation. Further, Trustee failed to inform the court about Sports's offer until after it had approved the sale to SBC. Trustee then, Sports argues, made false or misleading statements which unduly influenced and tainted the court's decision.

Although Trustee told Watt that he had received Sports's offer and that it was under consideration, he also recommended that Sports retain counsel and file an opposition to the Sale Motion, indicating that it had made an offer. Sports did not file an opposition or a formal offer, nor did it appear at the sale hearing. Trustee was not certain how serious the offer was, given its informal nature, and the lack of any filing with the court or appearance at the sale hearing did not help. Sports cites no law that required Trustee to discuss his concerns with Watt about Sports's offer or give him legal advice as to how to

16

proceed. Based on the record, Trustee's concerns over Sports's offer were justified, and Sports's argument that Trustee made false or misleading statements that unduly influenced or tainted the court's decision is unsupported. Further, and the point Sports misses, Trustee did consider the offer despite his uncertainties about it. However, based on the information he had at the time, he believed that SBC's offer was the better offer, and he articulated his reasons to the court. The court had no reason to doubt Trustee's business judgment.

Finally, Sports argues that it and other interested parties were deprived of a meaningful opportunity to bid or participate in the sale because Trustee failed to serve the Sale Motion on all parties. For sales under § 363(b), the requirement of notice and a hearing "operates to provide both a means of objecting and a method for attracting interest by potential purchasers." *In re Lahijani*, 325 B.R. at 288-89. Sports argues that, ironically, Trustee averred in the Sale Motion that presenting the Sale Agreement "to the Court will provide an opportunity for any other interested party to come forward, and the terms will be tested by the court." But, argues Sports, no such "opportunity" to "come forward" to "test the terms" was genuinely provided. Instead, the Sale Motion was heard on shortened time (just 13 days after it was filed), and Trustee served only the OST Order on all parties. Sports argues that the process was so rushed that it did not have sufficient time to retain Nevada counsel.

17

SBC has not briefed this issue on appeal. Trustee did not address it in opposing the motion to reconsider, and neither did SBC. However, Trustee and SBC's silence was not surprising since Sports did not raise the issue of Trustee's failure to serve the Sale Motion until its reply brief in support of its motion to reconsider. Nonetheless, counsel for Sports raised the issue at the hearing on the reconsideration motion, but neither Trustee nor counsel for SBC discussed it, and the court said nothing about it either. In the Sale Order, the court found that the Sale Motion and related pleadings had been properly served, which was incorrect. In denying reconsideration of the Sale Order, the court found that both the OST Order and the Sale Motion were served on the initial and additional lists of creditors, which, again, was incorrect.

This situation certainly gives us pause. However, despite the court's erroneous view that the Sale Motion had been served on all interested parties, Sports has not shown any prejudice by not being served with the Sale Motion. Debtor's counsel was served with it and promptly informed Watt of the terms of the sale. Watt, aware of the sale hearing date and opposition deadline, communicated an offer to Trustee four days after the Sale Motion was filed. After communicating the $50,000 offer, Sports had nine more days to secure U.S. counsel before the sale hearing, which was a sufficient amount of time to retain counsel to file something with the court, even if only a request for more time to oppose the sale or to file an offer. The court found that, because Sports communicated its offer well before the sale hearing, it had not demonstrated circumstances that prevented it from responding to the Sale Motion. No one

appeared at the sale hearing for Debtor, Sports, or the other nondebtor Miomni Entities, even though the hearing was available remotely.

Despite the lack of service of the Sale Motion, Sports and the other nondebtor Miomni Entities received actual notice of the sale, had a reasonable opportunity to object to the Sale Motion, communicated an offer to Trustee, and had an opportunity to set the Sale Order aside. Accordingly, they received adequate notice under Rule 2002(a)(2)[5] and (c)(1).[6] *See Advantage Healthplan, Inc. v. Potter*, 391 B.R. 521, 550-51 (D.D.C. 2008) (holding that notice was adequate under Rule 2002(a)(3) and that appellant did not suffer a due process violation by not receiving formal notice of a proposed settlement, when it had actual notice of the related hearing, the deadline by which it was required to object to the settlement, and the specific terms of the settlement agreement), *aff'd sub nom. Greater Se. Cmty. Hosp. Found., Inc. v. Potter*, 586 F.3d 1 (D.C. Cir. 2009); *In re Glinz*, 66 B.R. 88, 91 (D.N.D. 1986) (holding that unsecured creditors committee was not entitled to relief despite lack of formal notice of proposed sale of debtors' real property under Rule 2002, where the committee's attorney had actual knowledge of the sale and had an adequate opportunity to object at a settlement hearing).

---

[5] Rule 2002(a)(2) provides that the debtor, the trustee, and all creditors be given at least 21 days' notice by mail of a proposed sale of estate property other than in the ordinary course of business, unless the court for cause shown shortens the time or directs another method of giving notice.

[6] Rule 2002(c)(1) provides that notice of a proposed sale under Rule 2002(a)(2) shall include the time and place of any public sale, the terms and conditions of any private sale, and the time fixed for filing objections thereto. The notice of a proposed sale of property, including real estate, is sufficient if it generally describes the property.

As for other potential bidders, nearly all of whom are in the U.S. (and, specifically, in Nevada), they were served with the OST Order, which provided the date and time of the sale hearing, the deadline for filing an objection to the Sale Motion, and generally what was being sold – "causes of action." While the OST Order could have been more informative, we conclude that it provided sufficient notice to anyone who may have been interested in making an offer for the Claims. Other than the Miomni Entities, the only interested parties in the United Kingdom were two government agencies and a bank – unlikely bidders. And if any of these interested parties had an issue with the sale after the fact, they could have joined in Sports's motion to reconsider. Therefore, Sports's argument that offers were diminished because interested parties, especially those in the United Kingdom, were not served with the Sale Motion is not well-taken. Further, absent any evidence that Trustee intentionally failed to serve the Sale Motion on all interested parties, Sports's arguments do not support a finding that the sale was not conducted in good faith.

Realistically, given the nature of the assets being sold, the parties who required notice had sufficient notice of the sale to take some sort of action to protect their rights. Although we do not condone the mistakes that occurred in this case with respect to service, we conclude that notice was sufficient under the circumstances and is not a basis for reversing the bankruptcy court's finding of good faith under § 363(m).

**CONCLUSION**

The record does not reflect that there was fraud or collusion by or between SBC and Trustee, or that Trustee or SBC attempted to take gross unfair advantage of other bidders. The bankruptcy court's finding of good faith under § 363(m) was not illogical, implausible, or without support in the record. Accordingly, we AFFIRM.